**In re Steven Jacob FRECH, Debtor.**

**NORTH DAKOTA STATE BOARD OF HIGHER EDUCATION, Plaintiff,**

**v.**

**Steven Jacob FRECH, Defendant.**

**Bankruptcy No. 3–83–1879.**
**Adv. No. 3–84–0003.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

May 28, 1986.

Rick D. Johnson, Asst. Atty. Gen., Bismarck, N.D., for plaintiff.

Freya O. Hanson, Pine Island, Minn., for defendant.

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the undersigned United States Bankruptcy Judge for trial at St. Paul, Minnesota, on April 24, 1986. Plaintiff appeared by its attorney, Rick D. Johnson, Assistant Attorney General. Defendant Steven Jacob Frech (hereinafter "Debtor") appeared personally and by his attorney, Freya O. Hanson. Upon the evidence adduced at trial, trial briefs, arguments of counsel, and all of the other files, records, and proceedings herein, the Court makes the following Findings of Fact, Conclusions of Law, and Order for Judgment.

## FINDINGS OF FACT

Debtor is a doctor of veterinary medicine who filed a Voluntary Petition under Chapter 7 of the Bankruptcy Code in this Court on November 4, 1983. Debtor's bankruptcy schedules alleged that on that date he had no debt entitled to priority under the Bankruptcy Code, and only one secured debt, a loan from Norwest Bank Minneapolis secured by a 1983 Ford Ranger pickup truck. A complete summary of Debtor's scheduled unsecured debts is as follows:

| | | |
|---|---|---|
| State of North Dakota Board of Higher Education | Student Loan | $20,276.22 |
| Bank of North Dakota | Student Loan | 17,173.49 |
| United Accounts, Inc. | Open Account | 262.14 |
| Souris River Telephone Co. | Open Account | 240.34 |
| Sears | Open Account | 627.73 |
| Total | | $38,579.92 |

The first debt noted above is the subject of these adversary proceedings. Plaintiff[1] is a governmental entity of the State of North Dakota. It holds four promissory notes in its favor executed by Debtor, which are summarized as follows:

---

1. Plaintiff filed this adversary proceeding to determine the dischargeability of this debt under 11 U.S.C. § 523(a)(8). It need not have done so, as 11 U.S.C. § 523(a)(8) is self-executing. S.REP. No. 989, 95th Cong., 2d Sess. 79 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787; *In Re Albert*, 25 B.R. 98, 100 (Bankr.N.D.Ohio 1982). As Debtor bore the burden of production and persuasion on the issue of dischargeability, by all rights he should have commenced it. *See In Re Norman*, 25 B.R. 545 (Bankr.S.D. Calif.1982); *Shoberg v. Minn. Higher Educ. Coordinating Council*, 41 B.R. 684 (Bankr.D. Minn.1984).

| Date | Original Principal Amount |
|---|---|
| September 19, 1978 | $3,456.00 |
| September 17, 1979 | 3,879.00 |
| September 29, 1980 | 4,200.00 |
| June 15, 1981 | 6,185.00 |

Pursuant to their terms, all of these notes bear interest at the rate of 4% per year. The total principal and interest outstanding on these notes as of August 23, 1985, was $21,457.86; with interest accruing since that date, the total outstanding balance as of April 24, 1986 was $21,932.36.

Debtor is a thirty-five-year-old single man who at the date of trial resided in Princeton, Minnesota. He has no obligation of support to an ex-spouse or minor children. He is a native of Washington State, having graduated from high school there in 1968. He is a veteran of the United States Army, having served two years, six months in the Army Veterinary Service both in the United States and overseas.

Since his high school graduation, Debtor has been employed as a cabinet-maker and as a laborer and manager in several agricultural supply businesses; he has also worked at various odd jobs. He attended a total of approximately four years of college classes at Everett, Washington Community College and North Dakota State University at Fargo in the mid-1970's. In 1977 he applied for admission to veterinary school through the "Reciprocal Higher Education Agreement" program established by the North Dakota State Legislature.[2] Under this program, he was accepted for admission by the University of Minnesota Veterinary School. He commenced a four-year course of study there in the fall of 1978, and graduated with a D.V.M. degree in 1982.

The "Reciprocal Program" was established in the mid-1950's. Neither of the North Dakota state university systems has a veterinary school; thus, the North Dakota Legislature created the "Reciprocal Program" to allow North Dakota state residents access to veterinary medicine programs in the state university systems of neighboring states. North Dakota negotiates reservations of a set number of positions in each entering class in participating veterinary schools. Under the program, a North Dakota resident accepted into an out-of-state veterinary school pays the in-state tuition rate to that school, and the State of North Dakota reimburses the school for the difference between the in-state and out-of-state tuition rates. In 1963, the State of North Dakota enacted a requirement that all participating students execute promissory notes in favor of the State of North Dakota at yearly intervals for all amounts so disbursed by it. Under the notes and the terms of the "Policy Manual" for the program, the State of North Dakota gave the prospective veterinarian the opportunity to obtain a partial or full forgiveness of liability on the note by returning to North Dakota and practicing there for a period of one to three years. If the veterinarian did not elect to do so, Plaintiff scheduled the note for repayment over a term of years. Prior to October, 1982 the maximum length of this term under Plaintiff's "policies" was three years; thereafter it was six years. By legislation approved on March 4, 1983, the North Dakota Legislature abolished the note requirement entirely for students entering or continuing in veterinary and other professional programs after that date. However, this legislation provided:

> Section 2. For notes executed prior to July 1, 1983, the provisions of section 15–10–28.1 of the North Dakota Century Code as it exists on June 30, 1983, shall govern until the terms of such notes are fulfilled.

N.D.Sess.L.1983, ch. 198. Under this provision, all pre-July 1, 1983 notes were not forgiven and were to be enforced by the North Dakota State Board of Higher Education.

Debtor executed the four aforementioned notes pursuant to the statutory provisions in effect when he was in veterinary school.

**2.** This program was created by legislation presently codified at N.D.CENT.CODE. ch. 15–10.1.

He also financed his course of study through G.I. Bill assistance for his first two years of study, and through federally insured student loans from the Bank of North Dakota. (The consolidation of the latter is the second debt previously noted. Debtor does not seek discharge of that obligation in this adversary proceeding and does not intend to do so in a separate proceeding.)

Upon graduation, Debtor decided to return to North Dakota to commence his veterinary practice. His job search revealed only one opening for a new veterinary graduate, a position with an established veterinarian in Towner, North Dakota.[3] He was offered and given this position at an annual salary of $22,000.00. After practicing several months with this veterinarian, Debtor became dissatisfied with what he perceived as grossly unsanitary working conditions, lack of concern over sanitary measures in treatment, and a lack of professional standards in the performance of certain semi-official duties, though he now acknowledges that this employer's quality of medical treatment was "all right." His growing dissatisfaction caused Debtor considerable stress; he finally concluded that his working and living conditions were intolerable. After eight months on this job he resigned, before locating new employment.[4] After another search, Debtor concluded he would not find another veterinary position in North Dakota; he then took employment with a veterinarian in Pine Island, Minnesota at an annual salary of $18,000.00. The bulk of the Pine Island practice was in "large animal" veterinary services; his new employer required Debtor to purchase a pick-up truck and furnish it with a "veterinary unit" for the transportation, storage, and maintenance of his veterinary implements, refrigeration equipment, and water supply. Debtor purchased a brand-new pick-up truck with four-wheel drive and a new "veterinary unit"; he had to obtain financing for both purchases.[5]

Debtor was laid off from this employment in April, 1984, after his employer concluded that his practice was not generating sufficient income to retain a second veterinarian. From April, 1984 through the date of trial Debtor was employed in a three-veterinarian practice in Princeton, Minnesota, again mainly in "large animal" treatment, at an annual salary of $24,000.00. At trial he testified that he had just submitted his resignation from this position, to be effective May 2, 1986. He did this because his employer had advised him that he would not be able to give Debtor a pay raise for at least three years. Debtor now intends to seek employment in "small animal" veterinary practices in the Minneapolis-St. Paul urban area; as of the date of trial he also had interviewed with one or more rural Minnesota veterinarians with "large animal" practices. Debtor has allowed his North Dakota veterinary licensure to lapse and he is now licensed only in Minnesota.

At trial Debtor declined to state whether he himself would demand any particular salary level for a new job. He believes that, were he to continue to practice as an employee of another established veterinarian, he could expect never to make more than the present equivalent of $30,000.00 per year. It does appear, however, that his prospects for finding employment with an established veterinarian have been improved by his four years of practical expe-

---

3. At trial the parties disagreed as to the comprehensiveness of Debtor's post-graduation job search. Whether Debtor made an "adequate" job search or not is irrelevant.

4. At trial, the Court reserved ruling on the relevancy of Debtor's motivation for leaving this employment. The Court has determined this evidence is at least marginally relevant to the issues joined, and has made findings accordingly.

5. At trial, Plaintiff attempted to characterize the purchase of these two items in brand-new condition as somehow inappropriate. This purchase was entirely reasonable under the circumstances, given the manifest requirements that Debtor have transportation reliable in all climatic conditions, refrigeration for vaccines and medicines, and a reliable water supply for sanitary and treatment purposes.

rience. Debtor's only other option in veterinary medicine is to establish his own practice. He does not believe that this alternative is feasible for him, given the large initial capital requirements and the negative effect which his bankruptcy filing has had on his personal creditworthiness. Plaintiff's own witness, the North Dakota State Veterinarian, admitted that income prospects in the near future for rural veterinarians in the Upper Midwest are marginal to poor, given the continued erosion of the agricultural economy and the immediate effects of the current U.S. Department of Agriculture "dairy buyout" program under which significant numbers of dairy farmers are liquidating their herds. He also testified to his conclusion that the current downward turn in the "propserity cycle" in the agricultural economy and the veterinary profession has been significantly longer and more serious than that in prior cycles in his experience.

As of the date of trial, Debtor's current gross monthly income was $1,833.00. Payroll withholding for federal and state income taxes and social security totaled $460.00. Debtor therefore had a net monthly income of $1,373.00.

Debtor's necessary monthly living expenses as of the date of trial were as follows:

| | |
|---|---|
| Housing (rent) | $190.00 |
| Utilities | 135.00 |
| Norwest Bank Minneapolis (truck payment) | 243.27 |
| North American States Leasing (veterinary unit payment) | 129.82 |
| Food and cigarettes | 200.00 |
| Licenses and professional dues | 1.67 |
| Clothing and laundry (work and personal) | 50.00 |
| Transportation (gas, oil, upkeep, license, insurance) | 182.00 |
| Medical and dental | unknown |
| Health and disability insurance | 46.00 |
| Entertainment | 50.00 |
| Legal expenses | unknown |
| Glasses | unknown |
| Miscellaneous (toiletries, dog food, professional books, gifts) | 50.00 |
| Total | $1,296.09 |

During three years of practice in Princeton, Debtor put 62,000 miles on his 1983 Ford pick-up. In April, 1987 he will make the last payment on the financing on it. It does not appear that he will have to replace the vehicle immediately. In May, 1986 Debtor was to make the last payment on the financing on his veterinary unit. It needs some minor repair to correct several defects but is still serviceable and need not be replaced. Other than his truck and the veterinary unit, Debtor owns a modicum of furniture, personal property and personal effects. He has no bank accounts, pension entitlements, retirement funds, or any other liquid assets.

Debtor does not suffer from any medical condition which limits his employability in any way. He indicates that he enjoys veterinary practice and does not foresee himself doing anything else for a living; the limited financial prospects which he foresees for the profession have not dampened his desire to continue in it.

On or about March 1, 1983, after he obtained the Pine Island position, Debtor telephoned Plaintiff's main office. He spoke to Lloyd H. Nygaard, Assistant Commissioner of Higher Education, intending to make arrangements to commence payment on the four notes. Under cover of a letter dated March 24, 1983, Mr. Nygaard forwarded Debtor a payment schedule under which Debtor would commence making monthly payments of $339.30; over a term of six years the payment amount would gradually decrease to $274.70. After receiving the schedule, Debtor advised Mr. Nygaard that he could not make the initial scheduled payments and asked whether he could commence by making payments of interest alone or by some other arrangement. Mr. Nygaard made no response at that time other than to reiterate that Debtor had to pay the notes off in full over a term of six years. Debtor did not attempt to formulate an alternate payment schedule to accomplish this goal; neither did Mr. Nygaard. Under cover of a letter dated August 5, 1983, Plaintiff's trial counsel advised Debtor that Plaintiff intended to commence collection action if Debtor did not at least start making monthly payments "in an amount which is the maximum [Debtor

could] afford." In the letter counsel also advised Debtor that if he commenced making some regular payment, Plaintiff's Board would "suspend the file" for a period of one year, review it at that date, and then propose payment arrangements "in view of [Debtor's] financial circumstances at that time." After receiving this letter Debtor became angry, concluding (wrongly) that he had been accused of somehow acting in less than good faith and not fulfilling his obligations under the notes, and that Plaintiff was still insisting on payment in full under the earlier schedule. Plaintiff's counsel again advised Debtor through an August 31, 1983 letter to Debtor's bankruptcy counsel that at least initially Plaintiff was willing to accept "some kind of reasonable monthly payment." Debtor has made no payment to Plaintiff on any of the notes at any time. Plaintiff is now willing to accept payments from Debtor under a ten-year, eight-month payment schedule, commencing with a monthly payment of $100.00 which would increase once per year by $25.00 increments to $350.00 per month during the last eight months.

Debtor arranged to commence payment on his federally insured student loan from the Bank of North Dakota while he was in practice in Towner, North Dakota, and made monthly payments of $175.00 through the date on which he filed his bankruptcy Petition. He has not made any payments on this loan since he commenced his bankruptcy case, though he says he plans to recommence payments in the near future.

## CONCLUSIONS OF LAW

Debtor seeks to have his educational loan found dischargeable under the following provisions of 11 U.S.C. § 523(a)(8):

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

.     .     .     .     .

(8) for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or a non-profit institution, unless—

.     .     .     .     .

(B) excepting such debt from discharge under his paragraph will impose an undue hardship on the debtor and the debtor's dependents.

There is no dispute that the obligation running between Debtor and Plaintiff is "an educational loan made ... by a governmental unit ..." within the meaning of this provision.

In *Cossette v. Higher Education Assistance Foundation*, 41 B.R. 689 (Bankr.D. Minn.1984), this Court adopted the three-part "progressive" test for "undue hardship" which the Bankruptcy Courts have developed under this statutory provision and its predecessors.[6] *See also Shoberg v. Higher Education Assistance Foundation*, 41 B.R. 684 (Bankr.D.Minn.1984); *In Re Erickson*, 52 B.R. 154 (Bankr.D.N.D. 1985).

■ Under the three-part test, the Court's inquiry progresses through three stages which are commonly termed the "mechanical test," the "good faith test," and the "policy test." The Debtor bears the burden of proof on each test; if the Court finds against the Debtor at any particular stage, its inquiry ends and the debt will not be dischargeable in bankruptcy. *In Re Erickson* at 157.

Under the "mechanical test," the Court must consider a variety of factors in the debtor's vocational profile, including his current employment and income, future employment and income prospects, educational level and work skills, health, family support responsibilities, and the practical marketability of his work skills. The Court must determine the Debtor's current

---

6. This test was first enunciated in *In Re Johnson*, 5 B.C.D. 532 (Bankr.E.D.Pa.1979), and has since been applied in *In Re Albert, supra*, among numerous other reported decisions. It is generally applied in the Bankruptcy Court in this District. *See, e.g., In Re Isbin*, ADV 4–83–196 (Bankr.D.Minn. August 10, 1984).

household expenditures and their reasonableness in kind and amount, and must compare them with the debtor's current household income to calculate the debtor's current income surplus, if any. Fundamentally, the debtor bears the burden of showing that his income and other financial resources will not be sufficient to maintain him at a minimal or "poverty level" standard of living for the foreseeable future if he were under a continuing obligation to make some payment on the educational loan in question. *Cossette* at 691; *In Re Erickson* at 157. *See also, In Re Andrews,* 661 F.2d 702 (8th Cir.1981).

Upon satisfying the "mechanical test," the debtor must then satisfy the "good faith test," by showing that he is actively minimizing current household living expenses and maximizing his personal and professional resources. Fundamentally, the debtor must be currently making a strenuous effort to maximize his personal income, within the practical limitations of his vocational profile. *Cossette* at 691.

The third step is the "policy test." Practically speaking, this test is a salient factor most often in cases involving debtors with advanced or professional degrees. Congress enacted § 523(a)(8) and its predecessor provisions in response to a perceived abuse of bankruptcy remedies by debtors whose motivation in filing for bankruptcy was solely or primarily to discharge large government-insured student loan obligations. H.R.REP. No. 595, 95th Cong., 1st Sess. 133 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787; *In Re Brunner,* 46 B.R. 752 (Bankr.S.D.N.Y.1985); *In Re Wegfehrt,* 10 B.R. 826 (Bankr.N.D.Ohio 1981). Thus, in applying the "policy test" the Court must determine whether allowing discharge of a given educational loan would constitute the abuse of bankruptcy remedies with which Congress was concerned. Basically, the Court must determine the relative magnitude of the debtor's educational loan obligations as a component of his or her total debt structure, and in conjunction must consider the personal, professional, and financial benefit which the debtor has derived and will derive from

the education financed by the loans in question. *Cossette* at 691; *In Re Albert* at 101.

In the case at bar, Debtor has adopted a conscious strategy to selectively honor one of his two major educational loan obligations, and to seek discharge of the other in these proceedings. This approach nonpluses the Court. At trial Debtor readily admitted he "[had] something against" Plaintiff because of the manner in which Plaintiff's officers had treated him. Certainly, Debtor could be accused of coming to a court of equity with less-than-clean hands; there is no reason relevant under the Bankruptcy Code why he should be seeking discharge of only one of his educational loans while favoring the other. Also, accepting Debtor's strategy at face value and effectuating it in the calculations necessary under § 523(a)(8) prevents the Court from making a comprehensive evaluation of the undue hardship issue. If Debtor had wished to seek discharge of one of his educational loans, by all rights he should have sought discharge of *all* of them. This Court cannot brook this selective approach; accordingly, it will not take into consideration any proposed payments to the Bank of North Dakota in its calculation of Debtor's current and anticipated income surplus.

■ Too, the Court will not consider the prospect that Debtor was to become unemployed immediately after trial, and will not consider Debtor's post-trial income as being nothing or a negligible amount for any calculation under the "mechanical test." First, Debtor cannot be given any benefit in these proceedings for a decision (possibly ill-considered) to leave gainful employment without a commitment for substitute employment. Second, Debtor's future earning potential as a degreed and experienced professional is the salient factor, and not the fact of a present and temporary unemployment. *See In Re Rappaport,* 16 B.R. 615, 617 (Bankr.D.N.J.1981).

With these two conclusions structuring the Court's treatment of the evidence, we turn to the merits of the three-stage test.

■ Application of the "mechanical test" starts with the recognition that Debtor has a vocational profile which would be enviable to many people. He holds an advanced degree and has four years of extensive practical experience in his profession. He has no medical problem which has prevented or will prevent him from being fully employed in his profession. In testimony and argument Debtor dwelled at some length on the fact that his future income prospects are subject to upper limitations due to circumstances which admittedly are largely beyond his control. The Court can certainly sympathize with Debtor's frustration over his inability to command a sizeable salary despite having gone through a long and arduous education and several years of hard work. The veterinary profession is not the only one in which entry-level participants have experienced in recent years the disappointment of crowded job markets, high practice-maintenance expenses, and less-than-satisfactory employment terms and conditions. However, the fact remains that Debtor has derived salaries which have enabled him to live an adequate middle-class existence, even if they have not afforded him instant wealth. There is no indication that he will not continue to earn income of this level. The mere fact that Debtor's professional degree has not enabled him to earn more, or that it does not seem to have justified the cost of his education, does not support a finding of undue hardship. *In Re Fitzgerald*, 40 B.R. 528, 529–30 (Bankr.E.D.Pa. 1984).

Though Debtor's trial exhibits alleged no more than a marginal income surplus under his current budget, the Court's inquiry revealed that his current expenses have already dropped by the amount of the payment for his "veterinary unit" financing and will drop again by the amount of his truck payment in less than one year. These changes will free up a monthly sum in excess of $370.00, at least initially; even if Debtor has to obtain a substitute vehicle, given current interest rates he should be able to do so with a financing cost less than his historic one.[7]

■ Upon a thorough consideration of all of the evidence—including Plaintiff's evidence that it is willing to substantially restructure a payment schedule on Debtor's account—the Court concludes that Plaintiff has failed to meet the "mechanical test." [8] So long as Debtor's net income from future employment remains at a level comparable to that as of the date of trial, the Court concludes that in the near future Debtor will be able to maintain himself at something more than a minimal or "poverty level" standard of living and still meet the scheduled payments suggested by Plaintiff at trial. Over the course of the first year, Debtor's projected budgetary surplus of approximately $220.00 should be more than sufficient to satisfy the monthly payment of $100.00 to Plaintiff (and, not incidentally, to make a monthly payment in some amount to the Bank of North Dakota). After the satisfaction of the Norwest Bank Minneapolis truck loan in April, 1987 Debtor still will have the means to satisfy increased payments to Plaintiff. In addition, the logical inference from both parties' evidence of the current veterinary job market is that income prospects for urban "small animal" veterinarians are more stable and, probably, more promising than those for veterinarians practicing in the financially-troubled countryside. Debtor

---

7. The Court's review of Debtor's other budgetary items does not lead to the conclusion that Debtor is over-spending for any category of expense. Debtor's expenditures for entertainment and cigarettes are not of a magnitude to be objectionable; Plaintiff's argument to the contrary is really no more than carping, though Debtor may find it necessary to further limit his spending for these items if his income from any substitute employment is not substantially larger than his income as of the date of trial.

8. In so concluding, the Court has not taken into consideration any monthly payment which Debtor may make to the Bank of North Dakota, for the reasons discussed *supra* at p. 241. Debtor well may have to negotiate a readjustment of the payment schedule on that debt, in order to remain current on both of his educational loans.

himself testified that he would expect to "top out" at an income about 25% over his current income. If (as would be logically expected) his salary continues to increase by even minor increments during the ten-year payment period, he should be able to meet the graduated payments which Plaintiff has proposed.

■ This conclusion falls into line with the reported cases which have attempted to define the word "undue" as used in the statutory phrase "undue hardship." Several Courts have noted:

> "... mere financial adversity without more will not do ... the point is that Congress meant the extinguishment of student loans to be an available remedy to those severely disadvantaged economically as a result of unique factors which are so much a part of the [debtor's] life, present and in the foreseeable future, that the expectation of repayment is virtually non-existent unless by the effort the [debtor] strips himself of all that makes life worth living."

*In Re Briscoe,* 16 B.R. 128, 131 (Bankr.S.D. N.Y.1981), quoting from *In Re Kohn,* 5 B.C.D. 419, 424 (Bankr.S.D.N.Y.1979). A debtor does not establish undue hardship by proof that continuing responsibility for student loans would bring about "an unpleasantness," or a "garden-variety hardship." *In Re Lezer,* 21 B.R. 783 (Bankr.N. D.N.Y.1982); *In Re Ford,* 22 B.R. 442 (Bankr.W.D.N.Y.1982); *In Re Love,* 33 B.R. 753 (Bankr.E.D.Va.1983); *In Re Brunner,* 46 B.R. 752 (S.D.N.Y.1985). The hardship which would result from nondischargeability of student loans must be long-term. *In Re Bowen,* 37 B.R. 171, 172–3 (Bankr.M.D.Fla.1984); *In Re Goldman,* 48 B.R. 364 (Bankr.S.D.N.Y.1985). The Court must find "the certainty of hopelessness [of repayment], not simply a present inability to fulfill financial commitment." *In Re Briscoe* at 131; *In Re Brunner* at 755. *See also Perkins v. Vt. Student Assist. Corp.,* 11 B.R. 160, 162 (Bankr.D.Vt.1980); *In Re Norman* at 549. While this standard may seem draconian, Congress imposed the "undue hardship" requirement for discharge at least in part because government-granted or -insured educational loans are not strictly analogous to debts incurred in the consumer economy. The legislation creating the various student loan programs bars loan-granting institutions from applying more traditional standards for evaluating of credit-worthiness; it also locks lenders into fixed and relatively low interest rates. "In return for giving aid to individuals who represent poor credit risks, it strips these individuals of the refuge of bankruptcy in all but extreme circumstances." *In Re Brunner* at 756. Thus, the Courts have denied discharge of student loans even in cases where a debtor's alleged household expenditures exceeded current income, so long as that income was something in excess of the poverty level, and the debtor had the real prospect of future income increases. *See, e.g., In Re Lezer; In Re Springer,* 54 B.R. 910 (Bankr.D.Neb.1985). The latter opinion is instructive in the present case. In *Springer* the husband-and-wife debtors had financed educational programs leading to advanced degrees, but had been unable to earn more than moderate salaries in a succession of short-term jobs. They had substantial family support obligations (which are lacking in the instant case) and had no apparent income surplus whatsoever. Nonetheless, the Court concluded that the debtors' educational loans were not dischargeable under § 523(a)(8)(B), noting the strong likelihood that the debtors' child care and other family support obligations would decrease and the accumulation of longer-term job experience would allow both debtors to "graduate" to more stable and lucrative employment.

■ As the Court has concluded that Debtor has not met the first prong of the three-part test, its inquiry might stop at this point.[9] However, it is appropriate to

---

**9.** However, the Court does note that though Debtor has probably met the "good faith test"—inasmuch as he has remained gainfully employed throughout a period of rapid decline in the rural economy and rural veterinary practice—he almost certainly has not met the "policy

address a major point which Debtor's counsel argued in closing. Had Debtor enrolled in the "Reciprocal Program" after July 1, 1983, Plaintiff would not have required him to execute promissory notes as a condition of his participation; the State of North Dakota in effect would have furnished him with an education at a cost equal to the in-state tuition rate at his veterinary school. Clark Wold, Plaintiff's Assistant Commissioner currently in charge of the Reciprocal Program, testified that the North Dakota State Legislature based its repeal of the note requirement on equity considerations, recognizing that students enrolled at the law and medical schools in the North Dakota state university systems had never been required to execute promissory notes for any portion of the cost of their education and nonetheless had gotten the full benefit of a professional degree. The legislative history material stipulated into evidence by the parties fully support this testimony. On this basis, Debtor argues that continuing his responsibility under the promissory notes by denying discharge of his liability would work an "undue hardship" on him solely because he went through veterinary school at the historical point immediately prior to the repeal of the note requirement, when the cost of veterinary education and, thus, the face amount of the notes were at an all-time high.

Unfortunately, this argument misses the point. While Debtor's argument is quite compelling if viewed in the light of public policy, it does not address the specific concerns to which this Court is limited in applying § 523(a)(8). Debtor's argument is

not really that denying discharge would work an "undue hardship; the Court must determine "undue hardship" only with reference to the three-step test. Rather, Debtor's argument is more appropriately summarized as follows: denying discharge of Debtor's educational loans would work an "unjust hardship." This Court readily concludes that the North Dakota Legislature fell far short of working complete "equity" in prospectively repealing the note requirement but not forgiving liability for notes executed prior to July 1, 1983. At least on the evidence before this Court, there is no justification under considerations of legislative fairness for continuing pre-repeal liability; there was no instate practice requirement for students enrolled in the North Dakota state law and medical schools in 1978–83, and during those same years "Reciprocal Program" students such as Debtor found the face amounts of their program notes increasing almost exponentially on a yearly basis. However, as unfair or unjust as this treatment may seem, it is not a factor which this Court can take into consideration under § 523(a)(8). Rather, it is a matter of public policy which can only be—and probably should be—addressed by the North Dakota State Legislature.[10]

Having reached the conclusion that Debtor's obligation to Plaintiff is nondischargeable under § 523(a)(8), the Court concludes that it is nonetheless free to afford Debtor some protection. The Court will not alter Plaintiff's rights via discharge of part of the principal balance of Debtor's obligation. See *Shoberg* at 608. However, the Court may alter or structure Plaintiff's rights to

test." The Court does not impute any bad faith to Debtor in his initial decision to seek bankruptcy relief, even if his treatment of Plaintiff throughout this adversary proceeding suggests he did harbor malice of some degree toward it. However, Congress did not intend to make a debtor's bad faith or malice against educational lenders relevant to the policy test. The parties have stipulated that educational loans comprise 97% of Debtor's unsecured debt and 76.4% of Debtor's total secured and unsecured debt. Even had Debtor not admitted that he filed for bankruptcy to try to discharge his student loans, the composition of Debtor's debt structure

would virtually compel the conclusion that this was Debtor's motivation. See *In Re Curry,* 41 B.R. 312 (Bankr.E.D.Wis.1984).

10. If it is any consolation to Debtor, he is not alone. Bankruptcy Courts have shown virtually-unanimous reluctance to accord relief under the Code to medical-professional debtors who have not fulfilled practice requirements for forgiveness of educational loans. See, e.g., *In Re Vance,* 49 B.R. 973 (Bankr.D.Minn.1984); *In Re Avila,* 53 B.R. 933 (Bankr.W.D.N.Y.1985); *In Re Luna,* 54 B.R. 637 (Bankr.S.D.Fla.1984).

periodic payment to avoid the harsh effects which might otherwise flow from a finding of nondischargeability and grant of money judgment. Plaintiff has indicated that it is willing to accept payments on the restructured basis which Mr. Wold proposed at trial. To insure that Debtor's post-bankruptcy "fresh start" will not be impaired by uncontrolled garnishment or other use of collection process, the Court will embody this payment schedule into its judgment herein as a limitation on Plaintiff's collection rights. *See, e.g., In Re Curry* at 316. In addition, the Court will allow Debtor a three-month "grace period" to firm up his employment plans and personal finances to begin meeting his student loan obligations. Debtor is of course not prohibited from commencing payments during that period if he so elects.

| TIME | MONTHLY AMOUNTS |
|---|---|
| 9/1/96–4/31/97 | 350.00 |
| 5/1/97 | 204.11 |

Further, Plaintiff is and shall be restrained and enjoined from using any form of garnishment, levy or other collection process to collect on the judgment granted herein so long as Debtor makes voluntary payments in the amounts stated above to apply to the judgment granted herein.

LET JUDGMENT BE ENTERED ACCORDINGLY.

## ORDER FOR JUDGMENT

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. That Debtor's educational loan obligation to Plaintiff was excepted from the discharge in bankruptcy granted to Debtor by this Court's Order of March 6, 1984;

2. That Plaintiff is entitled to judgment against Debtor in the sum of $21,932.36;

3. That Plaintiff is and shall be restrained and enjoined from using any form of garnishment, levy or other collection process to collect on the judgment granted herein in any amount in excess of the maximum amount allowable under state law, or in excess of the following monthly amounts for the following time periods, whichever is less:

| TIME | MONTHLY AMOUNTS |
|---|---|
| 9/1/86–8/31/87 | $100.00 |
| 9/1/87–8/31/88 | 125.00 |
| 9/1/88–8/31/89 | 150.00 |
| 9/1/89–8/31/90 | 175.00 |
| 9/1/90–8/31/91 | 200.00 |
| 9/1/91–8/31/92 | 225.00 |
| 9/1/92–8/31/93 | 250.00 |
| 9/1/93–8/31/94 | 275.00 |
| 9/1/94–8/31/95 | 300.00 |
| 9/1/95–8/31/96 | 325.00 |