In re Thomas I. BERSCHEID and Lisa G. Berscheid, Debtors.

Thomas I. Berscheid, Plaintiff,

v.

Educational Credit Management Corporation, Defendant.

Bankruptcy No. 01–44796.
Adversary No. 02–4024.

United States Bankruptcy Court,
D. Minnesota.

Nov. 4, 2002.

Michael J. McNamara, Brooklyn Center, MN, for Plaintiff.

Christopher M. McCullough, Minneapolis, MN, for Defendant.

## FINDINGS OF FACT CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for trial before the undersigned United States Bankruptcy Judge on October 29, 2002, at 10:00 a.m. Plaintiff Thomas I. Berscheid ("Berscheid") was represented by Michael J. McNamara, and Defendant Educational Credit Management Corporation ("ECMC") was represented by Christopher M. McCullough.

The court having considered the evidence, the arguments of counsel, and all of the files, pleadings, and records, makes the following:

## FINDINGS OF FACT

1. Berscheid is 47 years old. His wife, Lisa G. Berscheid ("Lisa"), is 31 years old. The Berscheids have two children: Hannah, age 4, and Elijah, age 2. Lisa is pregnant with their third child. Hannah will be eligible to enter public kindergarten in the fall of 2003.

2. The Berscheids own a home in Howard Lake, Minnesota, where they have lived since October 1999. Howard Lake is approximately 45 miles from the Twin Cities.

3. Berscheid is currently employed as a marriage and family therapist and staff psychotherapist at Christian Recovery Center ("CRC") in Brooklyn Center, Minnesota. Berscheid began his employment at CRC with an internship in August 1995 and full-time employment in May 1996. Berscheid presently earns $21.00/hour, which translates to around $42,000 gross income per year. His monthly gross income is approximately $3,500.

4. Berscheid's gross monthly income at CRC is reduced by monthly deductions of $40.00 for Berscheid's voluntary 403(b) contribution, $630.44 for Berscheid's employee contribution to his employer-sponsored family health insurance plan, and social security and medicare. Berscheid does not deduct state or federal tax from his paycheck because he has generally paid no such taxes. Based on these deductions, Berscheid's monthly net income from employment at CRC is $2,753.73.

5. In addition to his CRC salary, Berscheid receives: (1) an annual Christmas bonus of approximately $100.00, and (2) additional income from honoraria and various other speaking engagements which, on average, yields between $75.00 and $125.00 per year.

6. Berscheid is in good health. He has no physical or mental disabilities, nor is he unable to perform any particular work functions. He is articulate, well educated, and made an impressive witness.

7. Lisa does not work outside the home. She remains home to care for the Berscheids' children. The Berscheids want to home school their children.

8. Lisa was employed outside the home as a nanny. Her gross annual earnings were $14,575.00 in 1999, $14,036.63 in 1998, and $26,571.46 in 1997. Her income dropped in 1998 when she apparently reduced her workload at the birth of Harmah. Lisa has a bachelor's degree in psychology and is in good health. She has no physical or mental disabilities, nor is she unable to perform any particular work functions.

9. In 1993, Berscheid graduated from Northwestern College in Roseville, Minnesota, and received a Bachelor of Sciences, triple majoring in communications, bible studies, and psychology.

10. In September 1996, Berscheid graduated from the Alfred Adler Institute of Minnesota and received a Master of Arts degree in Adlerian Psychotherapy and Counseling.

11. Berscheid is also a Licensed Marriage and Family Therapist, a Certified Clinical Criminal Justice Specialist, Master Addictions Counselor, and a licensed minister and a clinical member of the Association for the Treatment of Sexual Abusers.

12. Berscheid's monthly expenses are as follows:

| | |
|---|---|
| Mortgage: | $ 985.39 |
| **Utilities:** | |
| Cell Phone: | $ 41.00 |
| Internet: | $ 5.95 |
| Gas heat: | $ 42.00 |
| Electricity: | $ 39.00 |
| Local Phone: | $ 31.10 |
| Long Distance: | $ 17.00 |
| Water/sewer: | $ 67.00 |
| **Cars:** | |
| Gas, license, etc.: | $ 240.00 |
| Car payment: | $ 218.00 |
| Auto insurance: | $ 83.00 |
| Misc. insurance: | $ 4.67 |
| **Household items:** | |
| Medical co-pays: | $ 43.00 |
| Clothing: | $ 50.00 |
| Household supplies: | $ 165.00 |
| Groceries: | $ 630.00 |
| Dining out: | $ 70.00 |

| | | | | |
|---|---|---|---|---|
| Recreation/education: | $ 55.00 | | Loan from brother: | $ 30.00 |
| Lawn and home maintenance: | $ 30.00 | | | |
| Church donation: | $ 25.00 | | TOTAL | $3,052.11 |

Other:

| | |
|---|---|
| Continuing education: | $ 30.00 |
| Attorneys fees for this case: | $ 150.00 |

13. Berscheid is indebted to ECMC on ten separate unconsolidated loans:

| Loan # | Int. Rate | Rate Type | Prin Bal | Unpaid Int | Total Owed |
|---|---|---|---|---|---|
| 1 | 10.0000 | Semi–Fixed | $ 878.33 | $ 55.36 | $ 933.69 |
| 2 | 10.0000 | Semi–Fixed | $ 3,253.06 | $ 205.02 | $ 3,458.08 |
| 3 | 10.0000 | Semi–Fixed | $ 3,253.06 | $ 205.02 | $ 3,458.08 |
| 4 | 5.3800 | Variable | $ 5,159.85 | $ 197.73 | $ 5,357.58 |
| 5 | 4.8600 | Variable | $ 3,251.77 | $ 120.22 | $ 3,371.99 |
| 6 | 4.8600 | Variable | $ 7,427.83 | $ 274.62 | $ 7,702.45 |
| 7 | 4.8600 | Variable | $ 7,427.83 | $ 274.62 | $ 7,702.45 |
| 8 | 4.8600 | Variable | $ 7,427.82 | $ 274.62 | $ 7,702.44 |
| 9 | 4.8600 | Variable | $ 2,046.16 | $ 75.65 | $ 2,121.81 |
| 10 | 4.8600 | Variable | $ 818.46 . | $ 30.27 | $ 848.73 |
| Totals | | | $40,944.17 | $1,713.13 | $42,657.30 [1] |

14. Berscheid repaid $22,462.85 on his student loans owed to ECMC before filing Chapter 7 bankruptcy on November 6, 2001. Until he filed for bankruptcy relief, all his payments were timely. Discharge was entered by this Court on February 6, 2002, and the case was closed on May 13, 2002.

15. ECMC holds the right, title, and interest to Berscheid's entire loan balance.

16. The Berscheid family lives modestly. They own one vehicle, which is in the shop because they cannot afford repair. They are using a vehicle loaned by a family member. The family spends virtually nothing on clothes, entertainment and dental expenses, for which they have no insurance. They have no life insurance. The balance in the 403(b) retirement plan is about $1,200. They purchased their home for $118,000. The home is 45 miles from Berscheid's place of work. They could not find affordable housing closer to Berscheid's workplace. Had they remained in an apartment, their rent would have been roughly equal to their current mortgage payment.

17. Berscheid took his current employment because he believed that he was "called" to help people. His current position with a nonprofit allows him to serve a public which cannot pay. He is an educated, principled man who is devoted to his family and his work. His work with a nonprofit, however, keeps him from entering private practice where he would make more money. The Berscheids' commitment to home schooling their children means that Lisa, who is otherwise able and employable, will not want to work outside the home.

18. ECMC offered expert testimony on Berscheid's ability to increase his income. A vocational rehabilitation expert testified that if Berscheid left the nonprofit sector and entered private practice he would be able to earn, conservatively, $60,000 per year, and perhaps quite a bit more. Berscheid rebutted that testimony. He asserted that the basis for the expert's conclusion was data which did not have relevance to Berscheid's particular educational degrees and vastly overestimated Berscheid's ability to make more money. Berscheid has not, however, tested the

1. As of October 21, 2002.

market himself. He has not tried to find more gainful employment. He wants to stay where he is. I find that, contrary to Berscheid's position, if Berscheid left the nonprofit sector, it is very likely that he could make more money than he does now, approximately in the range noted by ECMC's expert.

19. Congress established the William D. Ford Federal Direct Loan Program ("Ford Program"). When a borrower consolidates student loans under the Ford Program, he is eligible to repay the loan as a function of his income under the Income Contingent Repayment Plan ("ICRP"). The ICRP provides for a repayment term of up to 25 years and allows borrowers to remain current on their loan obligations by paying the lesser of: (1) the repayment amount if repayment was to occur over 12 years multiplied by variable income factor which depends on adjusted gross income ("AGI"); or (2) 20% of their discretionary AGI minus the poverty level for the borrower's family size.

20. Borrowers release their income tax information to the Department of Education so the Department can calculate the borrower's ICRP payment. Interest continues to accrue during the ICRP repayment period, Because the borrower will be considered current on the loans under the ICRP, the borrower will also be eligible for forbearance if the borrower is unable to make the scheduled repayments, Finally, if the borrower has not repaid the loan in full at the end of the 25 year repayment period, the Secretary of Education cancels the unpaid balance.

21. Under the ICRP, Berscheid, based on his 2001 adjusted gross income of $21,793.13, his student loan balance of $42,657.30 (as of October 21, 2002), and a family size of four, would be required to pay $61.55 per month. Under the ICRP, the borrower's monthly repayment amount will be adjusted each year to reflect any changes in any of above-listed factors. In addition to this annual adjustment, the borrower's repayments may be adjusted during the year based on "special circumstances." For example, when his third child arrives, based on this increase in family size, Berscheid's monthly repayment amount under the ICRP would decrease from $61.55 per month to $10.22 per month.

22. Berscheid was made aware of (and understood) the ICRP and other available repayment plans, including the amounts of his monthly repayment. In addition, Berscheid was also made aware of (and understood) the fact that, under the ICRP, at the end of the 25–year repayment period, any remaining loan balance would be cancelled by the Secretary of Education. Berscheid declined to apply.

23. Berscheid has refused to participate in this program because he believes it is a "hopeless" road to further debt. At the rates noted, and assuming that his income does not increase significantly, Berscheid would still owe approximately $100,000 on his student loans at the age of 72. He would never reduce the debt. When he was 72, the full amount of the debt would be forgiven. However, he could also be subject to forgiveness of debt income tax liability on the remaining amount of the debt. Given his current circumstances, he would not be able to pay that income tax obligation. While this problem may be remedied by legislative change, that has not yet been done. Berscheid believes that it would be financially foolish to enter into such a program and chain himself to this debt until the end of his life. ECMC suggests that he is demonstrating bad faith by not signing up. It urges the program, in essence, is a flexible rolling hardship program which allows someone with staggering student loan debt

to "stay current" by paying little while family finances are tight, and increase or decrease the amount of the payment as the family circumstances change.

24. Hannah has childhood allergies (which appear to be getting better) and is being evaluated by the local school system for Autistio Spectrum Disorder. Elijah takes four different medicines for allergies. Their medical costs to date have been entirely covered by medical insurance, except for co-pays which are included in the budget. The Berscheids are firm in their conviction that, given the children's "special needs," Lisa is the right person to care for the children on a daily basis. I find that the children have no special medical needs which would require Lisa to stay home with the children. Except for Elijah's allergies, neither of them is currently being treated by a doctor for the medical conditions their parents fear they have had or may develop in the future. Lisa is doing staying home with her children because she wants to do so.

### CONCLUSIONS OF LAW

Section 523 of the Bankruptcy Code provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or non-profit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue

hardship on the debtor and the debtor's dependents; . . . .

11 U.S.C. § 523(a)(8).

■ The Bankruptcy Code provides for discharge of student loans only if the debtor demonstrates by a preponderance of the evidence that repayment of the loans would impose an "undue hardship" on the debtor and his or her dependent(s). *See Andrews v. South Dakota Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702, 704 (8th Cir.1981). The debtor bears the burden of proving undue hardship. *See Shoberg v. Minnesota Higher Educ. Coord. Council (In re Shoberg)*, 41 B.R. 684, 687 (Bankr.D.Minn.1984).

■ The Bankruptcy Code does not define "undue hardship," Congress clearly intended however, to safeguard the integrity of student loan programs by allowing the discharge of student loans only in "unique" or "exceptional" circumstances. *See Shoberg*, 41 B.R. at 687. "Undue hardship" means more than just mere hardship; instead, the hardship must be exceptional. *See North Dakota State Bd. of Higher Ed. v. Frech (In re Frech)*, 62 B.R. 235, 243 (Bankr.D.Minn.1986).

[M]ere financial adversity without more will not do ... the point is that Congress meant the exlinguishment of student loans to be an available remedy to those severely disadvantaged economically as a result of unique factors which are so much a part of the [debtor's] life, present and in the foreseeable future, that the expectation of repayment is virtually non-existent unless by the effort the [debtor] strips himself of all that makes life worth living.

*Id.* (*quoting Briscoe v. Bank of New York (In re Briscoe)*, 16 B.R. 128, 131 (Bankr. S.D.N.Y.1981)).

■ Consequently, the court in *Frech* held that a debtor cannot demonstrate

undue hardship by merely showing that repayment would bring about "an unpleasantness." *See Frech,* 62 B.R. at 243. Instead, the hardship must be long-term and severe. *Id.*

■ To determine whether requiring repayment of a student loan would be an undue hardship, courts in the Eighth Circuit employ a "totality of the circumstances" test. *See Andrews,* 661 F.2d at 704. The court must consider: (1) calculation of the debtor's and his dependents' reasonable necessary living expenses; (2) the debtor's past, present, and reasonably reliable future financial resources; and (3) any other relevant facts and circumstances surrounding this particular bankruptcy case. *Andresen v. Nebraska Student Loan Program, Inc., (In re Andresen),* 232 B.R. 127, 139 (8th Cir. BAP 2001).

1. Reasonably Necessary Living Expenses

■ The *Andresen* totality test requires courts to calculate the reasonable necessary living expenses of the debtor. *See Andresen,* 232 B.R. at 139. The debtor need not live below the poverty line to obtain a discharge of a student loan obligation, but the debtor must demonstrate an attempt to minimize living expenses in order to pay the student loan obligations. *See Frech,* 62 B.R. at 241; *see also United States Dept. of Ed. v. Rose (In re Rose),* 227 B.R. 518, 526 n. 11 (W.D.Mo.1998)(holding that the debtor should demonstrate that he has "done everything possible to minimize expenses . . . .").

With the exception of two items, Berscheid has done everything possible to minimize expenses. Berscheid includes within his budget (although he has not been able to actively pay them) $30.00 a month to repay his brother on a private loan Berscheid used to pay some of his attorneys' fees and $150.00 a month he wants to pay his attorney in this case. Debtor claims to have incurred over $10,000 in attorney's fees pursuing this case. The two noted expenses are simply an attempt to prefer one creditor over another, and would normally be considered extravagant, given the circumstances.

Elimination of these two expenses would free up $180.00 per month and would reduce Berscheid's monthly budget and living expenses. Since the Berscheids have expenses which exceed income by $300 each month, however, it makes no difference whether they include these two items or not. Even if they were eliminated, the Berscheids would still be operating on a $120 deficit each month.

There simply is no ground for finding excessive spending. To the contrary. Debtors are extremely frugal and their expenses reasonable. In sum, this factor weighs in favor of Berscheid.

2. Past, Present, and Reasonably Reliable Future Financial Resources

■ *Andresen* also requires that courts examine the debtor's past, present, and reasonably reliable future financial resources. *See Andresen,* 232 B.R. at 139. This means that I must determine if Berscheid's financial resources—including anticipated future increases—are sufficient to provide for a "minimal standard of living" for the foreseeable future, while still leaving some money to repay student loan debts. *See Frech,* 62 B.R. at 241 (citations omitted). Berscheid should demonstrate that he has "done everything possible to . . . maximize income." *Rose,* 227 B.R. at 526 n. 11. The evaluation of a debtor's financial resources necessarily involves a certain amount of speculation about the debtor's financial circumstances. *See Andrews,* 661 F.2d at 705 n. 5.

As explained in *Frech*, the threshold question is whether Berscheid's financial resources—including anticipated future increases—are sufficient to provide for a "minimal standard of living" for the foreseeable future, while still leaving some money to repay student loan debts. Assuming that Berscheid does not enroll in the ICRP (and he is wise in not doing so), Berscheid's financial resources would not cover student loan repayments under other alternative repayment plans.

The issue, however, is whether Berscheid is entitled to make the lifestyle choices he has made and still demonstrate that he has done "everything possible to ... maximize income." He cannot Berscheid has a number of ways to bring in more revenue and net income. First, Berscheid could seek out additional speaking engagements and opportunities for increased honoraria as he has done in previous years. Second, as ECMC's expert testified at trial, given Berscheid's educational background, work experience, and licenses and certifications, Berscheid is capable of earning greater income if he were to pursue job opportunities as a marriage and family therapist in the private sector. Third, Lisa is entirely capable of obtaining employment on a full-time or part-time basis. She might consider taking children into the home for care. This would allow the Berscheid children to remain at home with their mother (consistent with Berscheid's wishes that their children be home-schooled), while also generating some additional income. Alternatively, the Berscheids could, when the time comes, place their children in public schools thereby allowing Lisa to obtain employment outside the home.

Berscheid's failure to seek out additional sources of income for himself and the decision that Lisa must remain at home so the children can be home-schooled are personal life style decisions. Having made them, Berscheid has not "done everything possible to maximize income." This factor weighs in favor of ECMC.

### 3. Other Relevant Facts and Circumstances

■ Under the third prong of the totality test articulated in *Andresen*, courts must also consider "any other" relevant facts and circumstances specific to the bankruptcy case. *See Andresen*, 232 B.R. at 139. Such case-specific facts and circumstances can include:

> "[I]llness in the debtor's family; incapacity; good faith efforts to pay; whether hardship in repaying the loan would be long-term; debtor's status according to poverty guidelines; time spans between graduation; maturation of the loan and the filed petition; excess income in the debtor's budget, reaffirmation agreements entered into, if any; and the ratio of student loan to the indebtedness."

*Powers v. Southwest Student Serv. Corp. (In re Powers)*, 235 B.R. 894, 900 (Bankr. W.D.Mo.1999) (citation omitted).

■ ECMC urges that the court should consider Berscheid's declination to enter the ICRP program. I will not do so. This is a program which dooms a debtor to perpetual indebtedness for student loan obligations. Unless Berscheid significantly increases his income, he would go to his grave either indebted to ECMC or, if not, indebted to the IRS on the tax obligation incurred when ECMC forgives the unpaid loan. This is not a wise move.

### 4. Analysis of All Factors

On balance, Berscheid has not carried his burden of proof. Given Berscheid's good health, relatively young age, stable career and earnings potential, and Lisa's education and strong childcare back-

**14**

ground, there is no reason to think that Berscheid and his family will suffer any long-term hardship if Berscheid is required to pay his student loans owed to ECMC. While Berscheid may have difficulty paying ECMC now, with modest lifestyle changes and the strong possibility that the family's financial resources could be increased to repay the student loan debt owed to ECMC, it would be inappropriate to grant Berscheid the relief he requests.

ACCORDINGLY, IT IS HEREBY ORDERED THAT the debt to ECMC is not discharged in this bankruptcy case.

LET JUDGMENT BE ENTERED ACCORDINGLY.