In re Deborah WHITE, Bankrupt.

NEW YORK STATE HIGHER EDUCATION SERVICES CORPORATION, Plaintiff,

v.

Deborah WHITE, Defendant.

Bankruptcy No. 78–B–1260.

United States Bankruptcy Court, S. D. New York.

June 11, 1980.

Lawrence W. O'Toole, Albany, N. Y., for plaintiff.

Jeff L. Greenup, New York City, for defendant.

## MEMORANDUM OPINION

ROY BABITT, Bankruptcy Judge:

Defendant–bankrupt, Deborah White, filed her voluntary petition on July 7, 1978 under the relevant provisions of the now–repealed 1898 Bankruptcy Act.[1] That filing automatically adjudged her a bankrupt under Section 18(f), 11 U.S.C. (1976 ed.)

§ 41(f). Among the unpaid debts she scheduled were those owing the New York State Higher Education Service Corporation (NYSHESC) as guarantor of student loans which the bankrupt had taken in order to secure a college education. The loans were evidenced by notes for $3,620.00 dated March, 1977, and $1,250.00 dated June, 1977. Repayment of the former was to begin in August, 1977; the latter, in March, 1978.

Relying on 20 U.S.C. § 1087–3 to the effect that debts such as these could not be discharged in bankruptcy absent "undue hardship", the NYSHESC, as plaintiff, following the appropriate procedural rules, filed a complaint, Rule 703, 411 U.S. 1069, 93 S.Ct. 3147, 37 L.Ed.2d lxvi, alleging that the debts were not within the bankrupt's discharge. Rule 701(7), 411 U.S. 1068, 93 S.Ct. 3147, 37 L.Ed.2d lxvi.

The sole question is whether, on the evidence, the defendant–bankrupt is within the exculpatory "undue hardship" exception of 20 U.S.C. § 1087–3.[2] If she is, plaintiff's suit to have the debt survive defendant's discharge fails; if not, the student loans may not be discharged.

Although the legislative history of what emerged in 1976 as Congress' first attempt to deal with the distressing facility with which impatient student borrowers could procure discharge of their loans plainly shows Congress' mood, virtually no guidance is given as to the interpretation of the "undue hardship" attenuation of the reach of the section. See *Matter of Kohn*, 20 CBC 994, 999–1002, 1005 (S.D.N.Y.1979, Babitt, *B. J.*). However, enough is found in the discussions of the impact of bankruptcy on student loans to suggest that a showing by a bankrupt that the petition was filed in good faith does not preclude a finding that undue hardship is not present. See 123 Cong.Rec. H11, 705 (daily ed. October 27,

---

1. Section 403(a) of Title IV of Pub.L. 95-598, the 1978 bankruptcy reform legislation which was effective on October 1, 1979, retains the vitality of the 1898 Bankruptcy Act as to pending cases and proceedings begun under the latter. Therefore, the repeal of the 1898 Act by Section 401(a) of the 1978 statute is of no moment in this suit.

2. The defendant does not question the operative effect of 20 U.S.C. § 1087·3 despite its checkered history between its enactment in 1976 and the enactment of its mate in Section 523(a)(8) of the 1978 Code.

See *In re Adamo, et al.*, 619 F.2d 216 (2d Cir. April 16, 1980; *Matter of Kohn*, 20 CBC 994 (S.D.N.Y.1979, Babitt, *B. J.*).

1977, remarks of Congressman Volkner) and 123 Cong.Rec. E6, 610 (daily ed. October 27, 1977, remarks of Congressman Dodd); H.R. Report 95–595 to accompany H.R. 8200, 95th Cong., 1st Sess. 136–162 (1977), U.S. Code Cong. & Admin.News 1978, p. 5787.[3]

The conclusion drawn from Congress' feeling on the subject is that the overall good to be achieved by legislating specifically in this area outweighed the burden on the bankrupt student educated at public expense in the expectation that such learning would enhance future productivity.[4] And, while the enactment of Section 523(a)(8) in the 1978 Code of a provision comparable to that involved here is not necessarily controlling, it is relevant in gauging the mood of Congress. See *FHA v. The Darlington, Inc.*, 358 U.S. 84, 90, 79 S.Ct. 141, 145, 3 L.Ed.2d 132 (1958); *In re Adamo, et al., supra*, n. 2.

The evidence, as finally viewed, showed that the bankrupt, 30 years of age, healthy and able to work, and now educated in the area of "urban studies" could keep life and limb together for herself and her daughter while not living opulently. About $40.00 per month could be found to service the debt in dispute here and even less might be willingly accepted by plaintiff pending a positive turn in the bankrupt's financial life. Indeed, the bankrupt has chosen the bankruptcy route well within the five year period described in 20 U.S.C. § 1087–3 rather than to await a change in her fortunes. No effort was even made to ask plaintiff to forbear, a course permitted by 20 U.S.C. § 1077.

■ It is no answer that the bankrupt is not presently employed in her chosen area. The statute clearly recognizes that sometimes careers start hard in the early days following emergence from institutions of higher learning. But this recognition is dealt with as Congress viewed it, not as the bankrupt would like it.[5]

■ Nor does the fact that present employment is part–time, by choice or otherwise, nor that it might end, require a finding of undue hardship within the meaning of 20 U.S.C. § 1087–3. As this court observed in *Matter of Kohn, supra*, if temporary unemployment were the basis for release of student loan debts, bankrupts would be encouraged to come here unemployed, await full release of their student loan debts, and then pick and choose their employment. The whole point is that this bankrupt cannot show "undue hardship" just because the start of her career has been delayed. Indeed, that delay might be due, in part, by her need now to work part–time. But Congress took into account all the private and personal problems people have in getting where they think they should be in life when it granted a deferral period. "Undue hardship" means more than present difficulty in starting out. If that difficulty were to control, there would be no significance to the five year period within which the discharge is not so easily available.

It should be understood that the court is sensitive to the plight of economically pressed people. The court is sensitive to the overall adverse impact on people of having to cope day to day on a meager

3. H.R. Report 95–595 is relevant to an earlier version of H.R. 8200 than that which was offered on September 28, 1978 and which was enacted as Pub.L. 95–598 in 1978 with Senate changes. As seen, this 1978 statute deals with student loans in the bankruptcy context in Section 523(a)(8). The path leading to this section and the reconciliation of House and Senate views is found in *Matter of Kohn, supra*.

4. See Ahart, *Discharging Student Loans in Bankruptcy*, 52 Am.Bankr.L.J. 201, n.10 at 204 (1978).

5. See Oversight Hearing before the Subcommittee on Postsecondary Education of the House Committee on Education and Labor, 95th Cong., 1st Sess. 7 (1977). Representative Meyner there observed that "[w]hile I sympathize with ... the many students who are unable to find employment which they believe to be commensurate with their level of education, I do not believe that this gives them a license to steal." It is noteworthy, and not disputed by the bankrupt, that after her 1975 graduation from Marymount Manhattan College, she made another student loan, in May, 1977, to proceed further with her education but withdrew from Long Island University in June, 1977.

budget. But, this bankrupt has the potential to overcome her present plight because of the education Congress gave her, and the court wishes her well.

It is regrettable that Congress shed so inadequate a spotlight on the exculpating phrase "undue hardship". What can be gleaned is that the hardship is to be found in the exceptional case and must be based on something more than present inability to pay.[6] It is also regrettable that so much is therefore left to the individual view of each judge who, after all, brings the sum of who and what he was, what he has become, and what he sees through his own eyes to this basically disagreeable task.

Judgment must be rendered for the plaintiff declaring that this debt survives the bankrupt's discharge.

Submit an order.

---

6. See *e. g.*, Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Judiciary Committee on H.R. 31 and H.R. 32, early precursors to the 1978 Code, 94th Cong., 1st Sess. 1092 1093 (January 29, 1976). The requisite degree of hardship as the discussions there show would appear to be based on total inability ever to be meaningfully employed.