In Re Michael **LITTELL**, Nancy Jean Littell, Debtors.

Michael **LITTELL**, Nancy Jean Littell, Plaintiffs,

v.

**STATE OF OREGON** acting By and Through the **STATE BOARD OF HIGHER EDUCATION** for and on behalf of Portland State University and State of Oregon acting by and through the State Scholarship Commission, Defendants.

Bankruptcy No. 380–00082.
Adversary Proceeding No. 80–0062.

United States Bankruptcy Court, D. Oregon.

Aug. 21, 1980.

Donald J. Howe, Salem, Ore., for defendants.

Edward J. Jones, Oregon City, Ore., for plaintiffs.

## FINDINGS AND CONCLUSIONS

FOLGER JOHNSON, Bankruptcy Judge.

The debtors attended college before their marriage to each other. The husband graduated in December, 1976, and the wife in March, 1978. To assist with college expenses Michael Littell obtained a National Direct Student Loan for approximately $3,000.00 with the money paid to him in several increments. He was to start repaying the loan ten months after graduation with payments calculated at $90.00 or $95.00 quarterly.

Nancy Jean Littell had obtained two loans—one National Direct Student Loan for approximately $2,800.00 and a guaranteed student loan for $750.00. These were to be repaid at $23.33 and $13.23 a month, respectively. Neither plaintiff has repaid any part of the above loans, thus leaving a substantial delinquency.

At the time the debtors were married in September, 1978, Nancy Littell had two children by a former marriage and is now receiving only $30.00 a month from the father. She recently consulted an attorney to determine if the child support payments could be increased, but the attorney advised her that it would not be worthwhile to pursue the matter in court in view of the earnings and financial circumstances of the former husband.

Michael Littell who is now 34 years old had one son by a former marriage and is making monthly child support payments of $100.00 for the support of such son.

Both plaintiffs majored in education and English with the thought of becoming teachers. Upon graduation from college they were unable to find teaching jobs or other jobs which would utilize their college education although both applied for teach-

ing jobs and made an effort to find them both directly and through the state employment agency. Over a period of time the husband has worked at such jobs as an assistant to a landscape gardener, sanitation cleaner with Birdseye, a paper mill, a limited tutoring job through CETA, in charge of a residence at the Tongue Point Job Corp Center, and is now working as a service station attendant in Cannon Beach for wages of $4.40 an hour. This represents the highest paid position he has held since graduation and results in take–home pay of approximately $500.00 a month. Both he and his wife worked for a while on her parents' farm which resulted in negligible income for them.

Some time after their marriage the debtors moved to Cannon Beach as they preferred that area as a place to live and to raise their children and since they had not been able to obtain desirable employment in the Portland area. They found it very difficult to find any teaching job as the teacher turnover is very low, but the wife did do substitute teaching for periods not exceeding a week at a time, and she worked for a while in a grocery store. Through CETA she was able to obtain a half–time position as counselor in the community college in Astoria and still holds that position. Her place of employment is approximately thirty miles from her home. She stated, however, that the existence of the position would continue only as long as the voters continued to approve tax levies for the schools or the tax base would otherwise permit, and that her job is assured only for another year. Her net pay is approximately $450.00 a month giving the debtors a combined useable income, including the $30.00 child support, of $980.00.

They rent an old house with rent and utilities amounting to $320.00 a month. The house is heated by a wood stove and they gather most of the wood for this on the beach rather than buying it. The wife is also a good seamstress and makes the majority of the clothes for the family. They estimated car expense at $125.00 a month, food at $300.00 a month, medical, dental, and other miscellaneous expenses at $170.00 a month and in addition to this there is the $100.00 child support payment the husband owes each month. This gives them a budget of $1,015.00 which exceeds their income by $35.00 thus leaving no available excess for payment of student loans.

They are both in good health except that the husband suffers from tendonitis in his right elbow and therefore cannot take a job which would exert too much stress on it. They have a 1970 AMC Hornet which is necessary for the wife to go to and from her job and an old GMC pick up which is not operable. It therefore appears that before long the purchase of a new vehicle will be necessary. The bankruptcy schedules listed debts of $10,388.00. All but some $3,000.00 of this sum represents the student loans. The wife testified, however, that the reason for the bankruptcy was not to avoid payment of the student loans but to stop harassment by the other creditors, however, that they are not in a position to repay the student loans and would find it an undue hardship on themselves and the children.

### Conclusions

In the case of *In re Kirch*, 4 BCD 680 (1978), the bankruptcy judge denied dischargeability of the student loan, but the defendant was in good health, single with no dependents, had no excessive expenses and had made no significant effort to find a job commensurate with his education.

In the case of *In re Deborah Lee Johnson*, 5 BCD 532 (E.D.Pa.1979), Bankruptcy Judge Thomas Twardowski discusses at length various factors taken into consideration in determining whether an insured student loan should be dischargeable. While I agree with the final result in which the judge held the student loan obligation dischargeable for hardship reasons, I do not agree with his initial conclusion of dischargeability based on the premise that there was, in effect, no law in existence upon which a student loan could be excepted from discharge. The bankruptcy was filed before November 6, 1978, but the

judge apparently believed that the law to be applied in a case of dischargeability was the law in effect when the court passes judgment, not the law at the time the case was filed. At the time of the *Johnson* decision, there was a "gap" in bankruptcy law resulting from the fact that the Bankruptcy Reform Act was enacted on November 6, 1978, and repealed the existing non-dischargeability provisions for insured student loans on that date, but the new Code restoring such nondischargeability was not made effective until October 1, 1979. I disagree with this approach. The "gap" question should be irrelevant since I believe it is the law in effect at the time of the filing of a bankruptcy which should control the adjudication of rights that existed at the time of such filing. In dischargeability matters some courts may have selected the date of entry of discharge instead, but to apply the law in effect at the time a judge's decision is handed down would produce too many inequities. The enforcement of rights is suspended when a bankruptcy is filed, and we shall not have equal justice if the final outcome depends on the time it takes the courts to reach a final determination of what those rights are with the possibility of intervening legislation affecting such outcome. In exemption questions, for instance, it is well settled that the debtor may not benefit from a change in the law taking effect after the filing of the bankruptcy.

In the *Johnson* case Judge Twardowski quotes from the Report of the Commission on the Bankruptcy Laws of the United States in 1973 which set forth various tests to be applied in determining undue hardship. With this as a helpful foundation he then expands on such guidelines as current employment and rate of pay; the skills, education and health of the debtor; his ability to obtain and retain regular employment; his access to necessary transportation; his necessary expenses taking into consideration his marital status and number of dependents; whether the wife is able to work; whether any necessities are furnished in kind such as housing or food; and the different living standards in various geographical areas. Outside sources of income should be considered as well as the possibility of extraordinary expenses. In short, the judge must not merely consider the current status of the debtor but must look into the future and try to estimate what his future situation will be. Has his education put him in a better position to obtain desirable employment? The court also considers good faith an element—has the debtor made any effort to try to repay the loan since it first became due?

The court, however, places the entire onus on the debtor. In many cases student loans are granted through a college to students who have little aptitude or chance of succeeding in life. They may be taking a curriculum which will not lead to satisfactory employment. They may be encouraged to take courses, for instance, in education when the market is already overloaded with teachers, many of whom cannot obtain jobs, but the college professor teaching those classes is in need of more students. If a college were to lose many of its students attending by benefit of student loans, this would be a serious loss to the college as it would represent a substantial diminution of income without a corresponding diminution of expenses. There is thus great pressure and temptation on the part of college authorities to encourage students to apply for loans and grant them when in effect it is not a sound economic thing to do. This should be a substantial factor in determining whether a student loan should be dischargeable. Was the student inveigled into obtaining the loan and taking particular courses in college when the college authorities should have known that upon graduation from college the student had little chance of obtaining employment in that field? In many cases after the loan first became due the college has made little or no effort to collect even though several years may have elapsed. It must be assumed that the college felt the student did not have adequate means of repayment to make collection efforts worthwhile.

There are clearly many student loan decisions reported and the opposing results have

depended on the facts and the court's application of such facts. To discuss other cases would serve no purpose.

In nearly every case the court has held a loan completely dischargeable or nondischargeable. In some cases the bankruptcy judge appears to have taken the position that a debtor should not be able to walk away from student loan obligations unscathed. This has resulted in judgments of nondischargeability where the facts clearly showed hardship. Even though it might be undue hardship for a debtor to repay the entire loan, some payment might be feasible. Instead of the all or nothing approach, the courts should consider whether only part of the debt should be nondischargeable and what monthly payment the debtor could afford.

Since five years have not elapsed since the first payment on the Littell loans became due, they can only be discharged on grounds of undue hardship. The husband's first payment became due in October, 1977. Since the wife graduated 15 months after the husband, it can be assumed that the first payment on her loans became due in January, 1979.

The Littells have made a sincere effort to find suitable work in the education field with negligible success. Their expenses are at least equal to their income and they have kept such expenses low by gathering firewood on the beach to heat their home and by making the majority of their own clothes. This is not something the average family is expected to do and would not have been possible if the wife also held a full time position. There is no reason to believe that the employment or economic situation of the Littells will improve in the next few years. There is also no showing that any collection efforts were made by defendants prior to the filing of the bankruptcy.

The Court concludes that it would be an undue hardship on the Littells to pay the entire student loans, but that, by a reasonable additional effort, some payment could be made.

Each spouse should pay $10.00 a month on the National Direct Student Loan of such spouse with the husband's payments to continue for 33 months and the wife's for 48 months, being the time between the filing of the bankruptcy and the end of the five year nondischargeable period. The guaranteed student loan of the wife which bears higher interest is fully dischargeable on hardship grounds.