In re Randy Lewis BRYANT, Debtor.

Randy Lewis BRYANT, Plaintiff,

v.

PENNSYLVANIA HIGHER EDU-
CATION ASSISTANCE
AGENCY, Defendant.

In re Mary GAMBLE, Debtor.

Mary GAMBLE, Plaintiff,

v.

PENNSYLVANIA HIGHER EDU-
CATION ASSISTANCE
AGENCY, Defendant.

In re Paul PINE, Debtor.

Paul PINE, Plaintiff,

v.

PENNSYLVANIA HIGHER EDU-
CATION ASSISTANCE
AGENCY, Defendant.

Bankruptcy Nos. 85–01125S, 85–03945K
and 86–03862S.
Adv. Nos. 86–1269S, 86–1042S
and 86–1020S.

United States Bankruptcy Court,
E.D. Pennsylvania.

April 30, 1987.

Michael Donahue, Chester, Pa., for debt-
or/plaintiff.

K. Kevin Murphy, PHEAA, Harrisburg,
Pa., for defendant/PHEAA.

Horace A. Stern, Philadelphia, Pa., trustee.

William Schaps, Philadelphia, Pa., trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The issue before the Court in all three (3) of these Chapter 7 adversarial proceedings is the dischargeability of student loans on the grounds of undue hardship pursuant to 11 U.S.C. § 523(a)(8)(B). The Court has consolidated the resolution of these proceedings for reasons of efficiency and judicial economy. The happenstance of three cases with the identical legal issue being ripe for determination in such proximity of each other also presents the Court with an opportunity to develop broad principles for deciding such matters, which can be applied in not only these three cases, but in future similar matters. We hold that, for the purposes of § 523(a)(8)(B), "undue hardship" exists (1) Where the debtor has net income which is not substantially greater than federal poverty guidelines, because a debtor so living perforce is unable to maintain a minimal standard of living and make payments on student loans; or (2) Where the debtor has income substantially above the aforesaid poverty guidelines, but there is a presence of "unique" or "extraordinary" circumstances which render it unlikely that the debtor will be able to repay his or her student loan obligations. Applying these tests, this Court finds that the student loan obligations of Debtors Bryant and Gamble are dischargeable under § 523(a)(8)(B), but that the student loan obligations of Debtor Pine is not dischargeable under that provision.

In light of the fact that the instant decision will dispose of three proceedings, which we have consolidated for resolution only, we have altered the usual order in drafting our Opinion. We shall first discuss the pertinent legal issues in a General Discussion, then present Findings of Fact, Conclusions of Law and a brief Discussion in each individual case.

### B. GENERAL DISCUSSION

In each of the cases *sub judice*, the Debtors filed adversarial complaints against the Pennsylvania Higher Education Assistance Agency (hereinafter referred to as "PHEAA") to determine the dischargeability of each of their respective student loans, pursuant to 11 U.S.C. § 523(a)(8)(B).

PHEAA is a guarantor of each of the aforementioned loans, and has objected to the discharge of these obligations under that provision. The Debtors specifically invoke that portion of § 523(a)(8)(B) which provides that governmentally guaranteed or insured educational loans on which the loan payments became due within five years of the debtor's bankruptcy filing may be discharged only where "... excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents." [1]

There is no definition of "undue hardship" in the Code. Rather, this determination is left to the courts, many of which have held that a court must examine each factual situation and decide each case on its

---

1. The entire text of § 523(a)(8) reads as follows:
   Sec. 523. Exemptions to discharge.
   (a) A discharge under section 727, 1141, [or 1328(b)], 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt— ...

   .     .     .     .     .

   (8) for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, unless—
   (A) such loan first became due before five years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or

   (B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents; ...

   We note that none of the Debtors qualify under § 523(a)(8)(A), although we note that, had Bryant delayed until the date of trial of his adversarial proceeding to file his Petition, he would have been able to successfully invoke this provision. We note that he filed his bankruptcy pro se, and that, with some well-placed advice, might have achieved his discharge on that basis. However, this element is not a factor in our decision.

own merits. *See In re Birden,* 17 B.R. 891 (Bankr.E.D.Pa.1982); *In re Clay,* 12 B.R. 251 (Bankr.D.Iowa 1981). An examination of the myriad of cases on this issue reveals, we submit, the lack of any attempt to formulate a relatively simple objective test by which to measure "undue hardship" which we find is necessary to us in making consistent decisions in this area.[2]

■ The test which we propose strives to place the element of objectivity into the process of decision-making in this area. We propose, as a starting position, to analyze the income and resources of the debtor and his dependents in relation to federal poverty guidelines established by the United States Bureau of the Census and determine the dischargeability of the student loan obligation on the basis of whether the debtor's income is substantially over the amounts set forth in those guidelines or not. If not, a discharge will result only if the debtor can establish "unique" and "extraordinary" circumstances which should nevertheless render the debt dischargeable. If the debtor's income is below or close to the guideline, the lender can prevail only by establishing that circumstances exist which render these guidelines unrealistic, such as the debtor's failure to maximize his resources or clear prospects of the debtor for future income increases. We feel that such a test will decrease, if not eliminate, the resort to the unbridled subjectivity which seems to pervade many of the decisions in this area.

We arrive at this test by analyzing the purpose of § 523(a)(8)(B), as indicated in the Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 137, 93rd Cong., 1st Sess., II, 140, 141 (Appendix 2) (1973), which stated as follows:

> in order to determine ... 'undue hardship'; ... the rate and amount of [the debtor's] future resources should be estimated reasonably in terms of ability to obtain, retain, and continue employment and the rate of pay that can be expected. Any unearned income or other wealth which the debtor can be expected to receive should also be taken into account. The total amount of income, its reliability, and the periodicity of its receipt should be adequate to maintain the debtor and his dependents at a *minimal standard of living within their management capacity, as well as to pay the educational debt* (emphasis added).

Thus, Congress desired that debtors who were not able to maintain a minimal standard of living should be discharged of their student loan obligations, per § 523(a)(8)(B). That is what our test measures.

We are certainly not alone in making the inquiry of whether the debtor's income is sufficient to maintain a minimal standard of living *and* to pay the student loans in a § 523(a)(8)(B) analysis. *See, e.g., In re Frech,* 62 B.R. 235 (Bankr.D.Minn.1986); *In re Marion,* 61 B.R. 815 (Bankr.W.D.Pa. 1986); and *In re Johnson,* 5 B.C.D. 532 (Bankr.E.D.Pa.1979). However, we do recognize that no previous court decision has, like us, made this inquiry quite so fundamental to the determination of whether undue hardship exists in any given case as we intend to do in applying our test.

**2.** In the leading case on this issue arising in this Court, *In re Johnson,* 5 B.C.D. 532 (Bankr.E.D. Pa.1979), Chief Judge Twardowski develops a comprehensive and thoughtful, but unfortunately complicated three-part progressive test, each level of which has numerous inquiries to be answered before proceeding to the next level. While we find the *Johnson* Opinion very helpful in cataloging circumstances which can be considered by courts in such matters, we respectfully decline to follow the *Johnson* test. In fact, the complicated nature of that test has encouraged us, here, to strive for the result of objective simplicity. We should also note that we disagree with the attachment of any significance to the factor set forth in the first part of the *Johnson* "policy test," in which the court considers the amount and percentage of student loan indebtedness to all of the debtor's indebtedness in the bankruptcy, in order to determine whether the dominant purpose of the bankruptcy was to discharge the student loan. In *In re Gathright,* 67 B.R. 384, 391 (Bankr.E.D.Pa.1986) *appeal dismissed,* 71 B.R. 343 (E.D.Pa.1987), we observed that avoiding the consequences of debts is normally the reason for filing for bankruptcy and the fact that the Debtor seeks to discharge almost exclusively student loan obligations in his bankruptcy should be irrelevant. We believe that this factor should likewise be entirely irrelevant in a § 523(a)(8)(B) analysis.

A question presented at the outset is: What is the definition of "a minimal standard of living?" While it is unlikely that this phrase requires, in all cases, that a debtor be living below the federal poverty guideline in order to meet the undue hardship standard, we hold that where the debtor's gross income *is* at, near or below the federal poverty guidelines, that *would* fulfill the meaning of "minimal standard of living," *see In re Keenan,* 53 B.R. 913 (Bankr.D.Conn.1985); *Johnson, supra,* 5 B.C.D. at 544, and hold that perforce a debtor so economically situated is not able to make payments on any student loans and that hence student loans of such debtors must be *ipso facto* dischargeable on the basis of undue hardship.

Although not of record in any of the three cases *sub judice,* this Court will take judicial notice of the "Preliminary Estimate of Poverty Thresholds in 1986" published by the Bureau of the Census, January 22, 1987, and of the federal poverty guidelines published in Volume 52, Number 34, page 5340 of the Federal Register on February 20, 1987. See Federal Rules of Evidence 201(b); *Mitchell v. Rose,* 570 F.2d 129, 132 n. 2 (6th Cir.1978), *rev'd on other grounds,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979) (court may take judicial notice of census figures). Federal Regulations provide that the Department of Health and Human Services issue and update poverty income guidelines on an annual basis, which guidelines are used as an eligibility criterion by a number of federal assistance programs. 52 Fed.Reg. 5340 (February 20, 1987). "The poverty guidelines are a simplified version of the poverty thresholds used by the Bureau of the Census." *Id.* Both the poverty guidelines and the thresholds vary according to the size of the family and hence take into consideration the issue of the dependents or the unit of which the debtor is a dependent. The thresholds and the guidelines are updated each year by factoring in the change in the average annual Consumer Price Index. *Id.* The 1987 federal poverty income guideline for one person, in all states except Alaska and Hawaii, is $5,500.00.[3]

We believe that use of the federal poverty guidelines to determine undue hardship is appropriate because it is an objective test. Furthermore, since these poverty guidelines are used as eligibility criterion for federal assistance programs, it appears obvious that such income levels are viewed as being bare subsistence levels which cause such persons to be deemed incapable of affording to pay for certain necessary services. Thus, we feel comfortable in concluding that such persons cannot afford to repay governmentally-guaranteed student loans. The only revision which we will make is utilizing "net income" rather than "gross income" of the debtor in applying this test. Since the poverty-guideline figures are, in our view, extremely grim, see page seven and note three *supra,* we feel that doing so is a very slight dispensation, and one that is the most faithful to our desire to evaluate the resources actually available to the debtor.[4]

The Court believes that this simple test complies with Congressional intent to deal with a perceived abuse by those seeking to discharge governmentally guaranteed or

---

**3.** The guidelines further provide as follows for larger families:

| Size | Poverty Line |
|---|---|
| 2 | $ 7,400.00 |
| 3 | 9,300.00 |
| 4 | 11,200.00 |
| 5 | 13,100.00 |
| 6 | 15,000.00 |
| 7 | 16,900.00 |
| 8 | 18,800.00 |
| more than 8 | add $1,900.00 per person |

**4.** The pertinent Regulations define income as "total annual cash receipts before taxes from all sources." 52 Fed.Reg. 5340 (February 20, 1987);

45 C.F.R. § 1060.2–2(d)(1) (1986). This means that these guidelines are calculated in terms of gross income rather than net income. This element results in discrimination against the "working poor," i.e., people employed at low-paying jobs, as opposed to those whose income is from a non-taxable government-benefit program like welfare or social security. Although the Bureau of the Census may have justifiable reasons for so classifying citizens, for our purposes of determining what assets a debtor has available to maintain a minimal standard of living, it appears that only the net income figure is pertinent. We shall therefore calculate a debtor's net income in applying the poverty guidelines.

insured student loans in bankruptcy. We agree with the statement of the court in *In re Ford*, 22 B.R. 442, 445 (Bankr.W.D.N.Y. 1982), that "Congressional policy focused on excepting the discharge in those inequitable situations where individuals with superior education and employment skills were abusing the relief afforded by the bankruptcy laws." It is quite apparent that such "abuses" are not unchecked by allowing discharges to persons whose income is at or below the poverty guidelines.

As a result, we further hold that, only if a debtor's income is significantly greater than the poverty guideline, would it become necessary to evaluate the myriad of factors and circumstances, which courts presently examine, to determine whether the debtor's situation manifests such "unique" or "extraordinary" circumstances as to allow discharge of a governmentally-guaranteed student loan debt on the basis of undue hardship. Of course, in striving for objectivity, we do not intend to be rigid. If the net annual income of a debtor and his dependents is very close to the poverty line, a result of dischargeability may be in order. Further, if the debtor's income does not fall at or near the poverty guidelines, a finding of "undue hardship" could result from the presence of "unique" or "extraordinary" circumstances which impose a financial burden that would render it unlikely that the debtor would ever be able to honor such obligations. Such circumstances are more than an "unpleasantness" associated with the repayment of the educational debt. *In re Love*, 33 B.R. 753, 754–55 (Bankr.E.D.Va.1983). *See also In re Rappaport*, 16 B.R. 615, 616 (Bankr.D.N.J.1981); and *In re Briscoe*, 16 B.R. 128 (Bankr.S.D.N.Y. 1981). The existence of the adjective "undue" indicates that Congress viewed garden-variety hardship as insufficient to warrant the discharge of a student loan. *In re Brunner*, 46 B.R. 752, 753 (S.D.N.Y.1985). In attempting to shed some light on the meaning of "undue hardship," courts have noted:

> ... mere financial adversity without more will not do.... The point is that Congress meant the extinguishment of student loans to be an available remedy to those severely disadvantaged economi-

cally as a result of unique factors which are so much a part of the [debtor's] life, present and in the foreseeable future, that the expectation of repayment is virtually non-existent.... *Briscoe, supra,* at 131 quoting *In Matter of Kohn*, 5 B.C.D. 419, 424 (Bankr.S.D.N.Y.1979).

Of course, there should be some measure of gradation in what constitutes a "unique" or "extraordinary" circumstance depending upon the magnitude by which the income of the debtor exceeds the poverty guidelines. Thus, a less extraordinary circumstance would justify a discharge of a debtor whose income is slightly over the guidelines, while a very significant circumstance would be necessary to serve a debtor whose income is comfortably over the guidelines.

It might be contended that excepting student loans from discharge, on the basis of income at or beneath the poverty line, in the absence of "unique" or "extraordinary" circumstances, is too harsh a test for debtors. However, we do not believe that the definition of "undue hardship" so as to allow the discharge of student loan obligations in Chapter 7 cases *should* be interpreted liberally, given that debtors may obtain the complete discharge of student loan obligations by filing a Chapter 13 petition instead of a Chapter 7 petition. The discharge provisions of Chapter 13, which are set forth in 11 U.S.C. § 1328(a), make it apparent that completion of payments under a confirmed plan will permit the discharge of debts provided for in the Plan which are otherwise non-dischargeable under Chapter 7. In *Gathright*, we held that the fact that debtor seeks to discharge a debt non-dischargeable in a Chapter 7 case, specifically a student loan obligation otherwise non-dischargeable per 11 U.S.C. § 523(a)(8), is irrelevant to the resolution of the issue of whether the debtor has proceeded "in good faith," since the relief sought is within the scope of the lawful goals of a Chapter 13 case. There, the issue of good faith arose when objections to confirmation of the proposed plan were filed by PHEAA pursuant to 11 U.S.C. § 1325(a)(3), based upon the fact that the debts under the Plan, of which the Debtor

was ultimately seeking discharge, were primarily composed of student loans. We recognized that fact and observed that, there, "the Debtor's filing of his Chapter 13 case was motivated almost exclusively by a desire to discharge student loan obligations which may have been non-dischargeable in a Chapter 7 case." *Id.* at 385. Nevertheless, we rejected PHEAA's contentions. It is thus significant that even a relatively small amount of payment on a student loan obligation through a Chapter 13 plan will permit the student loan, along with other debts, to be discharged. *See also In re Springer,* 54 B.R. 910, 915 (Bankr.D.Neb. 1985).

It is only when the first test of income vis-a-vis the poverty guideline is not met that this Court will look at the totality of circumstances to ascertain the existence of "unique" or "extraordinary" circumstances. *See In re Clay,* 12 B.R. 251, 255 (Bankr.N.D.Iowa 1981). *Accord: In re Motor,* 64 B.R. 317 (Bankr.W.D.Pa.1986); and *Springer, supra.* Some of the relevant factors to be considered are the debtor's living expenses and the reasonableness of those expenses. *In re Andrews,* 661 F.2d 702 (8th Cir.1981). Clearly the existence of any special expenses arising from such factors as physical or mental illness would constitute a "unique" and "extraordinary" circumstance. *See Andrews, supra; In re Binder,* 54 B.R. 736 (Bankr.D. N.D.1985); *In re Keenan,* 53 B.R. 913 (Bankr.D.Conn.1985); and *Johnson, supra.* Likewise, unusual responsibilities arising from the needs of any dependants, *see In re Bennett,* 38 B.R. 392 (Bankr.D.Mo.1984); and *In re Powelson,* 25 B.R. 274 (Bankr.D. Neb.1982), can be extraordinary circumstances so as to justify a finding of undue hardship. An examination of the debtor's financial situation, present and future, could reveal the existence of other extraordinary circumstances. This could include an examination of the debtor's employment history and possible prospects that income will decrease in the future. *See In re Frech,* 62 B.R. 235 (Bankr.D.Minn.1986); *Marion, supra; Brunner, supra; Bennett, supra, In re Bell,* 5 B.R. 461 (Bankr. N.D.Ga.1980); *Clay, supra;* and *Johnson, supra.* We also point out that, in applying the poverty guidelines, we will consider, as a unit, the debtor and his dependents. *See Marion, supra.*

On the other hand, one reason for our adopting an objective test, related to income, is that we feel strongly that our making moral judgments as to the appropriateness of expenditures by debtors should be kept to a minimum. *See Gathright, supra,* 67 B.R. at 387. We assume that debtors, like most people, will maximize their ability to earn income and will spend their money according to their own best needs. We find ourselves in disagreement with those courts which have denied discharges of student loans on the basis of whether any given expenses are justified, as these represent subjective value judgments concerning which we consider ourselves no better able to gauge than, generally, debtors themselves. *See, e.g. In re Packer,* 9 B.R. 884 (Bankr.D.Mass.1981); *In re Brock,* 4 B.R. 491 (Bankr.S.D.N.Y. 1980); *In re Price,* 1 B.R. 768 (Bankr.D.Hawaii 1980).

We also note that some courts, in § 523(a)(8)(B) cases, have become transfixed in analysis of whether the education obtained through the student loan has been of use to the debtor. For example, in *Powelson, supra,* 25 B.R. at 276, the court considered it appropriate to comment that the schooling financed by the loan had "not increased [the debtor's] job skills to any significant amount." Similarly, the court in *In re Littell,* 6 B.R. 85, 88 (Bankr.D.Ore. 1980), determined that "there is … great pressure and temptation on the part of college authorities to encourage students to apply for loans and grant them when in effect it is not a sound economic thing to do. This should be a substantial factor in determining whether a student loan should be dischargeable."

Other courts have held, however, that "the mere possession of a college degree opens many doors of opportunity that would otherwise be slammed shut. To reap the benefits of the degree without shouldering the responsibility, even if it be in some limited capacity, is not acceptable …, unless there exists a uniquely dev-

astating hardship." *Motor, supra,* 64 B.R. at 318. Likewise, this Court, in *In re Fitzgerald,* 40 B.R. 528 (Bankr.E.D.Pa.1984) (per GOLDHABER, CH. J.), agreed, in dictum, with the rationale of *In re Albert,* 25 B.R. 98, 102 (Bankr.N.D.Ohio 1982), which held that "[t]he purpose of these educational loans is to provide individuals with the means to improve their educational levels and their *chances* for success, not the fact of success." *Fitzgerald, supra* at 529–30.

We have mentioned these cases for two reasons. First, it gives us a good chance to show how we will apply our test. We hold that a debtor's "use" of his education is merely an element in determining his income and no more. Therefore, we believe that this factor is entirely irrelevant in itself in the application of our test.

Secondly, we are able to point out that this element is distinct from the analysis in which we would engage in determining whether a loan obligation pursuant to the Health Education Assistance Loan Act Program, 42 U.S.C. § 294f et seq. (hereinafter referred to as "HEAL"), may be discharged. There, in determining whether nondischarge of a debt "would be unconscionable," 42 U.S.C. § 294f(g)(2), which must be shown to obtain a discharge, we *would* consider, to at least some degree, whether the debtor in fact completed his medical education, because it is apparent to us that, in enacting the HEAL exclusion from a discharge in even a Chapter 13 bankruptcy unless certain conditions are met, Congress indicated a desire to prevent entirely a certain class of debts, i.e., loans incurred by doctors who were trying to avoid medical-school debts. *See In re Gronski,* 65 B.R. 932, 936 (Bankr.E.D.Pa. 1986).

Finally, we should also emphasize that lenders should and will, under our test, have, like debtors, the right to show "unique" and "extraordinary" circumstances which might render a debtor whose income is near or below the poverty line ineligible for a hardship discharge under § 523(a)(8)(B). Examples of such situations could be individuals who refuse, without good reason, to maximize their resources, or who have a distinct prospect of increased income in the immediate future, or whose circumstances are otherwise likely to undergo an imminent positive change. *See e.g., In re Ballard,* 60 B.R. 673 (Bankr. W.D.Va.1986); *Springer, supra;* and *Briscoe, supra.* However, we do caution lenders that we assume that debtors, as is the natural tendency of most persons in a capitalistic society, attempt to maximize their resources to live above the poverty line; and that, while it is perhaps human nature to be optimistic about the future, in general, present and past performance is the best indication of a debtor's future capabilities.

Also, where it becomes relevant because debtors above the poverty line are seeking discharge, lenders are free to question how truly "unique" and "extraordinary" a debtor's condition is, and can attempt to offset circumstances which have a negative impact on a debtor's income with positive ones.

However, we emphasize that, as the burden of both proof and persuasion will be upon debtors to convince us that "unique" and "extraordinary" circumstances exist which should justify discharge of debtors under § 523(a)(8)(B) whose income is well above the poverty line, so the lender who is skeptical of the debtor's present efforts and denials of future prospects must be prepared to meet the burden of both proof and persuasion in convincing us to deny a hardship discharge to a debtor whose income is near, at, or below the poverty line. Speculation and unproven insinuations will not do.

Having thus formulated our test, we now apply it to the facts of the cases of each of the Debtors before us.

## C. MARY GAMBLE

### 1. *Findings of Fact*

1. MARY GAMBLE (hereinafter referred to as "Gamble") filed a voluntary bankruptcy petition under Chapter 7 of Title 11, U.S.Code, on September 20, 1985.

2. Gamble filed an adversarial complaint against PHEAA on September 8, 1986, to determine the dischargeability of her student loan obligation of approximate-

ly $3,000.00 on the ground of undue hardship pursuant to 11 U.S.C. § 523(a)(8)(B).

3. On October 29, 1986, a hearing was conducted on this matter.

4. Gamble is a 25–year–old woman who graduated from high school in 1979.

5. Despite efforts to do so, Gamble was unable to find work from 1980 through 1983.

6. In 1983, Gamble enrolled in a two-year executive secretary training program at Delaware County Community College (hereinafter referred to as "DCCC"), which she attended part-time and full-time until 1985. With only two semesters left to obtain her certificate from DCCC, Gamble had to leave the program due to financial difficulties.

7. The student loan debts which Gamble seeks to have discharged were the loans that she received to attend DCCC, which are guaranteed by PHEAA.

8. Gamble's work history is as follows: While a student at DCCC she was employed in a work-study job in the nurse's office and worked part-time doing secretarial work. After leaving DCCC, Gamble worked two days as a temporary employee doing xeroxing, before obtaining work as a telephone solicitor, earning $4.00 an hour between November, 1985, and April, 1986.

9. As she has never had a driver's license, Gamble had to utilize public transportation to get to her job as telephone solicitor, the expense of which forced her to seek employment within walking distance of her home in Chester, Pa., an extremely economically-depressed city.

10. Gamble currently works part-time at a Kentucky Fried Chicken outlet in Chester at the minimum wage of $3.35 an hour.

11. Gamble is in good health, single, and has no dependents.

12. Gamble has lived alone and rented one room in a house with kitchen privileges in Chester since February, 1986, and pays $30.00 a week, or $129.00 per month, in rent. She does not own any of the furniture in the room that she rents. Prior to living alone, Gamble lived with her sister.

13. Gamble receives no financial help from family or friends.

14. Gamble's net income from her employment is approximately $240.00 per month and her expenses are approximately $250.00 per month.

15. Gamble has continually searched for better paying jobs. She has concentrated her search in the secretarial area, but has not been successful, as these jobs require experience that she does not have.

16. Gamble's search for a better paying job is limited because she cannot drive and naturally does not own a car. Therefore, Gamble's employment opportunities are limited to Chester, and to areas which are accessible by public transportation, and are limited further by the fact that transportation costs to places of employment outside of Chester will consume part of her earnings.

17. Gamble's prospects for full time employment at more than the minimum wage are poor because all of the jobs which she has sought in this category specify that experience which she lacks is necessary.

18. Gamble does not have a bank account.

19. Gamble has not utilized any of the training received from DCCC in any of the jobs held since DCCC. In any event, her training from DCCC is incomplete.

20. Gamble hopes to be able to afford to go to driving school and get a driver's license upon attaining a better-paying job.

21. Gamble's expenses are exceedingly modest, particularly the cost of her food, which is stated as $40.00 per month.

22. Gamble's other debts were for electricity, rent and a bill at Sears, Roebuck and Company.

23. Gamble's employment opportunities are limited, given her work history and limited skills.

24. Gamble's net annual income is $2,880.00, and her gross annual income about $4,000.00, working part-time, which is about half of below the 1987 poverty income guideline for one person of $5,500.00.

## 2. *Discussion/Conclusions of Law*

■ The Court finds that requiring Gamble to repay her student loan obligations would clearly be an undue hardship, and, as such, Gamble's student loans will be discharged pursuant to § 523(a)(8)(B).

By first comparing Gamble's income to the 1987 Poverty Income Guideline, it is apparent that, under our test, she is *ipso facto* unable to make payments on her student loans. Even her *gross* income is beneath the poverty guidelines. It is certainly not evident that her income is sufficient to even afford her a minimal standard of living.

We made additional Findings of Fact in Gamble's case, which were not needed to find her student loans dischargeable, to illustrate that there is nothing "unique" or "extraordinary" about Gamble's situation except to the extent that it underscores our holding that low income amounts to an extraordinary circumstance in itself. The Court believes that the facts of Gamble's case underscore the propriety of the test we have outlined above in allowing us to make quick, sure decisions in clear cases.

At trial, we expressed some surprise that PHEAA, which has a track record of settling many of these matters by agreeing that the debt was dischargeable pursuant to § 523(a)(8) when it appears likely that the debtor would prevail in an adversarial trial, did not do so in this case. The response was that it was believed that Gamble could obtain a driver's license and a car and that this would be her ticket out of confinement to the unattractive Chester job market. The difficulty with this hypothesis is that Gamble has no capital to get her driver's license, much less to purchase a car, and hence there is no indication of how the cycle of her poverty can be broken.

Thus, PHEAA has totally failed to meet any burden of showing "unique" or "extraordinary" standards which would cause us to find that Gamble's school loan should be nondischargeable, per § 523(a)(8), despite her income being well below the poverty line. Rather, it has presented us with wishful thinking. We certainly do not find that Gamble has in any way failed to attempt to maximimize her scarce resources.

To the contrary, she appears to be quite industrious and optimistic. We do not wish to dash this optimism, but her situation is that which cases such as *Littell, supra,* 6 B.R. at 88, would describe as "hopeless." In fact, so grim is her situation that those of Pine and even Bryant pale in comparison.

## D. PAUL PINE

### 1. *Findings of Fact*

1. PAUL PINE (hereinafter referred to as "Pine") filed a voluntary bankruptcy petition under Chapter 7 of Title 11, U.S. Code, on August 15, 1986.

2. On September 2, 1986, Pine filed an adversarial complaint against PHEAA to determine the dischargeability of his student loan obligation in the amount of $2,863.23 on the grounds of undue hardship, pursuant to 11 U.S.C. § 523(a)(8)(B).

3. A trial in this matter took place on November 25, 1986.

4. Pine received PHEAA-guaranteed student loans to attend the Venus Beauty School for nineteen months, and he graduated from this school in January, 1984. Pine had also attended DCCC between September, 1981, and June, 1982, taking liberal arts courses.

5. From the date of his graduation in January, 1984, through September, 1986, Pine worked steadily as a hairdresser at three different salons. For just under one (1) year, Pine worked at the Newtown Hair Center for thirty-five (35) to forty (40) hours per week, earning minimum wage. From December, 1984, until September, 1985, Pine worked at B. Altman, earning approximately $120.00 net per week plus forty-five (45%) percent commission on any monies earned in excess of twice his salary. Pine testified that he rarely earned any commissions. From September, 1985, until September, 1986, Pine worked at Salon 20, earning approximately $122.00 net per week.

6. In September, 1986, Pine voluntarily chose to leave the hairdressing profession to become the Assistant Manager at a Jeans West Store in the Springfield Mall,

where he was employed at the time of the hearing. Pine left hairdressing because it did not pay well.

7. Pine currently earns $182.50 gross pay per week, which yields $141.00 net income per week.

8. Pine is a twenty-three (23) year old male in excellent health, and has no dependents except as described herein.

9. Pine lives with his seventy-two year-old father who receives $512.00 per month in social security benefits; and they share expenses. The father, however, has expressed an interest in moving into a retirement home, at which point he will no longer be sharing expenses with Pine.

10. Pine's monthly expenses were stated by him to be as follows: Rent—$190.00, public transportation—$77.00, food—$150.00, clothing—$50.00, laundry—$4.00, life insurance—$10.25, current phone—$13.00, and phone arrearages acquired since filing his bankruptcy petition—$100.00 (total amount owed as of date of hearing—$465.00) for a total of $594.25 per month. He therefore presented a budget indicating that he had an excess of monthly income over expenditures of only about $10.00.

11. Pine testified that the absolute earliest he could hope to be promoted in his present employment would be December, 1987, or January, 1988, and, if promoted to manager, he would earn $220.00 gross per week. However, a promotion is not assured, as it would be dependent on three evaluations which take place over the course of eighteen (18) months and would only occur if a manager position became vacant or if a new store opened.

12. Pine owns nothing of value and does not have a bank account.

13. Pine has not made any payments on his student loans.

14. Pine's net yearly income of $7,332.00 is significantly greater than the 1987 poverty income guideline of $5,500.00 for a single person. His father appears

self-supporting and hence is not a dependent.[5]

15. There are no "unique" or "extraordinary" circumstances in Pine's case. Although his father may have represented a potential financial burden, the father's income appears sufficient to compensate for his own living expenses, and hence we cannot classify the father as a dependent.

16. At the hearing, PHEAA stipulated that it was currently requesting payment of $50.00 per month from Pine, but would accept payment of $30.00 per month from him on this loan obligation.

2. *Discussion/Conclusions of Law*

■ In applying the poverty guidelines, it is immediately apparent that Pine's income is significantly more than the 1987 poverty income guideline. Since he fails this test, Pine can prevail only if this Court finds that unique or extraordinary circumstances exist which would support a determination of undue hardship. We are constrained to hold that there are none that exist here.

Pine is a young man with various skills, and competent enough to be presently employed as an assistant manager of a retail clothing store. The facts of his case do not warrant a finding of unique circumstances. He is to be commended for his industriousness in leaving the hairdressing field when he found better paying opportunities elsewhere. However, his hairdressing skill may remain a resource in obtaining supplemental income or the opportunity to take advantage of a more lucrative opportunity to use these skills in the future.

Further, a perusal of Pine's income and expenses readily demonstrates that he possibly has the present ability to make payments on student loans, or very shortly will have this ability, because his payment on phone arrearages of $100.00 per month, included in his budget, will be at an end.

PHEAA has already stipulated to its willingness to accept payment in the amount of

5. Indeed, if we combined the income of Pine and his father, as we would do if we considered the father a dependent, we would have to add the father's income of $512.00 monthly, which would bring Pine's net family-unit income to $13,476.00 ($6,144.00 plus $7,332.00). This figure is far above the $7,400.00 poverty guideline figure for a family of two.

$30.00 per month on its loan from Pine. Given this fact, we feel comfortable in holding that Pine's student loans are non-dischargeable in the within Chapter 7 proceeding.[6]

## E. LEWIS BRYANT

### 1. *Findings of Fact*

1. RANDY LEWIS BRYANT (hereinafter referred to as "Bryant") filed a voluntary bankruptcy petition under Chapter 7 of Title 11, U.S.Code, pro se, on March 27, 1985.

2. Although his case was initially closed without the issue being resolved, Bryant ultimately successfully moved to reopen his case and, on October 24, 1986, filed, again pro se, an adversarial complaint against PHEAA to determine the dischargeability of his student loan obligation of approximately $11,000.00, plus interest, pursuant to 11 U.S.C. § 523(a)(8)(B).

3. On December 18, 1986, a trial in this matter took place.

4. Bryant incurred the student loans in issue to attend the University of Pittsburgh School of Law, from which he graduated in May, 1981.

5. However, since graduation, Bryant has taken the Pennsylvania bar examination on five occasions, and, although attending bar review courses more than once, he has not passed the examination, and, consequently, is not able to practice law. He testified that he intended on taking the Pennsylvania bar examination again in February, 1987.

6. Before attending law school, Bryant attended Lincoln University, graduating in 1977 with a Bachelor of Arts degree.

7. Bryant has had limited legal experience or employment since his graduation from law school. During the summer of 1981, Bryant wrote five or six briefs for an attorney while studying for the bar examination, earning $6.00 per hour. He worked part-time doing research and writing for a law firm from August, 1981, until the firm dissolved in April, 1982, during which time he earned $10.00 an hour for approximately twenty (20) hours per week.

8. Since the spring of 1982, Bryant has worked as a substitute teacher in various school districts. Initially, he was not certified, but he obtained his certification in December, 1983, as it had become required in order to do substitute teaching, in April, 1983. He has earned $38.00 or $45.00 per day in this work, depending on the school district in which he was performing his duties.

9. Bryant has been placed on the Philadelphia Board of Education list of substitute teachers, and, when he is called to work in Philadelphia, he currently earns $70.83 per day. When he is able to work there, he can earn a gross wage of between $210.00 and $280.00 weekly. His net pay is approximately sixty (60%) percent of his gross due to the mandatory deductions for, *inter alia*, taxes and a retirement fund. The Court's calculations conclude that sixty (60%) percent of Bryant's gross earnings result in a range of between $126.00 and $168.00 for his net weekly earnings if he works in the Philadelphia School District.

---

**6.** Some courts, most notably in *Love, supra* (court defers payments until date over two years in the future or when debtors' children graduate from college); *Albert, supra* (court sets up a detailed repayment schedule); and *Littell, supra* (court orders each spouse to pay $10.00 monthly until the end of the dischargeability period), have declared student loans non-dischargeable but ordered debtors to make certain, limited payments on these loans.

We believe that such Orders are tantamount to converting the debtor's case to a Chapter 13 case. While *perhaps* we would be empowered to do this under 11 U.S.C. § 105(a) or 707(b), we prefer to allow the debtor to decide whether he or she wishes to take advantage of Chapter 13. As we indicated in *Gathright, supra,* we do not intend to discriminate in any way against debtors who utilize Chapter 13 to discharge students loans, with the exception of HEAL loans. *See Gronski, supra.* It may also be relevant to Pine for us to observe that we are inclined to join the Opinion of the Court in *In re Metz,* 67 B.R. 462 (9th Cir.Bankr.App.1986), that the filing of a Chapter 13 case immediately subsequent to a Chapter 7 case (a "Chapter 20" case) is not necessarily an abuse of the Code. This would appear to be a potential resource to Pine if PHEAA does not hold up to its bargain.

10. However, Bryant testified that his net earnings from this work range between $173.00 and $183.00 every two (2) weeks. This figure is apparently arrived at by Bryant's calculating that he will work approximately eight (8) days every two (2) weeks, earning $38.00 per day gross.

11. By assuming that Bryant will work part-time at both rates, half of the time in the Philadelphia district and half of the time outside of Philadelphia, his net income would be approximately $500.00 per month and his gross income would be approximately $750.00 per month from substitute teaching. This figure is very close to Bryant's own testimony that he nets between $500.00 and $550.00 in a good month from this source. However, we further note that when the schools are closed for holidays or vacations, or if Bryant has less than a "good" month, his income would be considerably less.

12. Bryant has not always found employment during the summer when substitute teaching is generally unavailable. He testified that he did not work during the summers of 1982, 1983, 1984 (specifically because of illness), and 1986.

13. During the summer of 1985, Bryant worked for six weeks as a counsellor at a recreation center. He did not testify as to the amount of his earnings from this employment.

14. Bryant testified that he also works part-time as a counsellor in a methadone maintenance program, for four hours every Saturday morning, earning $7.50 per hour, and netting approximately $100.00 in additional income per month. We assume that this employment continues during the entire year, but it does not appear that this position is as secure or reliable as a full-time position.

15. Bryant testified credibly that he is continually looking for more lucrative employment, and that he hopes to pass the bar examination and to subsequently work as an attorney.

16. Bryant is a thirty-one (31) year old single man, who lives alone and has no dependents.

17. Bryant is a controlled diabetic, taking insulin on a regular basis. In the summer of 1984, he was hospitalized for about ten (10) days, at which time he was first diagnosed as diabetic, and it was discovered that various health problems were being caused by his diabetes. He testified that his health is currently "okay" and he did not indicate that, at any time, since that hospitalization, he has missed any significant time from employment due to his health.

18. Bryant's expenses are as follows: rent—$360.00, utilities—$18.00, phone—$16.00, insulin and needles—$12.00, clothing—$12.00, orthodontist—$45.00, life insurance—$15.00, public transportation—$45.00, and food—$81.00, for a total of $604.00 per month. Despite the considerable amount paid to the orthodontist, there was no testimony regarding the need or lack of need or the anticipated duration of this service.

19. Bryant also testified that his allowance of $81.00 per month for food was based on his receipt of an unspecified amount of food stamps, which was discontinued in December, 1986. Although Bryant failed to testify as to how much he would need to budget for food in light of the discontinuation of food stamps, we believe that a modest allowance of $130.00 per month for food is reasonable and that Bryant's budget should be adjusted to reflect this amount. Therefore, Bryant's monthly expenses amount to $653.00.

20. During the school year of nine months (September through May), we find that Bryant nets between $600.00 and $650.00 monthly from both of his places of employment, which is insufficient to pay his monthly expenditures. None of these expenditures appear excessive, and, indeed, $57.00 monthly is attributable to health problems.

21. Bryant's net annual income is approximately $5,700.00. We arrive at this figure by using the low figure which Bryant indicates that he earns in a "good" month (because we assume that there are "bad" months) and multiplying it by nine potentially "good" months (we exclude July, August and portions of January, June, September, and December when schools are not open), which totals

$4,500.00, adding to it $1,200.00 from the methadone program counselling work.

22. Bryant's 1987 monthly expenditures include $57.00 monthly for health-related problems ($12.00 for insulin and needles, $45.00 orthodonist) which are "unique" and "extraordinary" expenses and thus result in an effective decrease of his net income of $684.00 annually. Considering this deduction, his net income is slightly more than $5,000.00, which is less than the 1987 poverty guideline figure for one person of $5,500.00.

## 2. *Discussion/Conclusions of Law*

█ Bryant's case is, to our thinking, the most difficult of the three cases before us to resolve. Ultimately, we find that the facts that Bryant's annual income is at, rather than being significantly greater than, the 1987 poverty income guideline for one person and that he has shown some measure of what are widely recognized as "unique" and "extraordinary" circumstances, we must proceed to discharge his student loan debt pursuant to § 523(a)(8)(B).

Bryant points out, with some force, that he has not been employed on a permanent, full time basis since his graduation from law school in 1981. This is correct in one sense. Nevertheless, we must proceed to determine whether his income which he has received on a fairly regular basis, since 1981, is significantly in excess of the poverty guideline for one person. Clearly, it is not.

Although PHEAA's counsel diligently and properly attempted to show that Bryant had not maximized the resource of his law-school and college education, we are not prepared to say that this is so. We must observe that Bryant, like all of the Debtors before us in these cases, impressed us as extremely well-motivated. All attempts by PHEAA's counsel to suggest that Bryant could do better financially with more effort were entirely unsuccessful. He has tried to pass the bar examination and testified that he repeatedly enrolled in bar review courses which would assist him in doing so without success. He has also sought and obtained part-time employment, including two present engagements. We also note that, although Bryant's income was less than that of Pine, PHEAA made no mention of an attempt to negotiate payment terms. Perhaps this is because Bryant's loan was considerably larger than that of Pine. The amount of the loan is not, we find, a relevant factor in our determination. It merely makes the stakes higher for both parties.

PHEAA also argues what we would characterize as a "unique" or "extraordinary" circumstance that cuts in its favor due to the prospect that Bryant will ultimately pass the bar examination and become an attorney.[7] However, it cannot be seriously maintained that Bryant has not tried and, to date, failed completely in this endeavor. Moreover, as time passes between the date of his graduation from a prestigious law school and after five unsuccessful attempts, we find Bryant's prospects for passing the bar examination and being an attorney is thinking almost as wishful as hypothesizing the prospect that Debtor Mary Gamble will become the owner of a car. While we recognize that any assessment is just a prognosis, we cannot say that, with a period of six years after Bryant's law-school graduation upon which to reflect, a finding that he is unlikely to succeed is unreasonable. Given that the burden of proof is upon PHEAA to prove and persuade us that the prospect of increased income and enhanced circumstances is so distinct as to constitute a "unique" or "extraordinary" circumstance, we cannot and will not find that such a circumstance has been proven here.[8]

---

7. We are forced to observe that some attorneys practicing before this Court earn as much in two and one half hours as Bryant does in a month. *See In re Shaffer-Gordon Associates*, 68 B.R. 344, 350–51 (Bankr.E.D.Pa.1986).

8. We observe that the result which would be achieved by applying our test to the cases cited in PHEAA's Brief would probably be the same as the courts in those cases reached in almost

every case, although we would use a different reasoning process. Although not working in the field in which they received the education for which they obtained their respective student loans, which we agree, with those courts, is irrelevant, we note that the debtors in the following cases had earnings or immediate prospects of same well in excess of the 1987 poverty guidelines, which are higher today than when

We acknowledge that our calculations concerning Bryant's income are based on some element of guesswork. However, we found Bryant to be extremely candid, and not prone to exaggerating his circumstances, and we totally credit his testimony, especially since it was unrebutted and unimpeached by questioning from both the Court and PHEAA's able counsel, who had the tools of discovery and investigation from a pro se debtor, albeit a legally-trained pro se debtor, at his disposal. The $500.00 monthly net income figure for substitute teaching seems to us reasonable, given that it is the low estimate for a "good" month. We observe that employment as a substitute teacher is susceptible to not only the vagaries of school holidays, vacations, weather closings, and strikes, but also the unpredictable needs of school districts. Given these uncertainties, in the face of unrelenting needs to pay rent and buy food, and the possibility that Bryant has understated his food costs, especially in light of potential dietary restrictions arising from his diabetes, we are unwilling to set this figure any higher.

In considering Bryant's "unique" and "extraordinary" expenses, we observe that the costs attributable to his diabetes directly total $12.00 monthly for needles and insulin, or almost $200.00 annually for these items and, again noting his likely dietary needs, make it likely that his testimony of the consequences of this illness are understated. Reduction of $200.00 from his annual net income of $5,700.00 already places him almost at the poverty level. While the needs to treat his diabetic condition are more likely to be essential than his expenditures to an orthodontist, PHEAA has not, on this record, given us any basis to conclude that the Debtor's orthodontist bills are other than essential medical expenditures. Given the fact that the Debtor's income is at the poverty line in any event, we are inclined to factor in these costs, which brings Bryant's income clearly below the poverty guidelines. We also note that the use of the poverty-guideline test is not charitable to debtors, and that we repeat our statement that a debtor very close to the poverty line, whose income was not "significantly greater" than that indicated by the guidelines, would be discharged. Also, we indicated that a "less extraordinary circumstance" would be considered if the debtor's income was slightly over the guidelines. This is a case where the debtor's income, if over the guidelines at all, is certainly no more than slightly over them, and hence we are inclined to be charitable in making this allowance.

Thus, while Bryant's prospects are considerably brighter and his situation less dismal than that of Gamble, this Debtor, unlike Pine, meets our objective test. We

these cases were decided. *Compare Springer, supra* (family of four had income of over $15,-000.00 annually); *Fitzgerald, supra* (single debtor had net income of about $9,500.00 annually); *In re Lezer,* 21 B.R. 783 (Bankr.N.D.N.Y.1982) (debtor having annual net income of about $10,-000.00 for family of three not discharged, but debtor having income of about $9,000.00 annually for family of three was discharged. Although the distinction appears to turn on the better prospects and lower expenses of the debtor not discharged, we note that the 1987 poverty guideline for a family of three is presently $9,300.00, a figure between the income of the two debtors in issue there, and was probably less in 1982); *In re Kammerud,* 15 B.R. 1 (Bankr.S.D.Ohio 1980) (family of four had annual income of $17,500.00); *Packer, supra* (single debtor had net income of about $9,000.00 annually); and *In re Henry,* 4 B.R. 495 (Bankr.S. D.N.Y.1980) (single debtor about to begin employment at $12,500.00 annually).

In two cases cited, *United States v. Collier,* 8 B.R. 909 (Bankr.S.D.Ohio 1981); and *In re White,* 6 B.R. 26 (Bankr.S.D.N.Y.1980), the respective debtors were employed, although the courts give no financial data on their income. While the *White* debtor's employment was part-time, the court characterizes the debtor's circumstances as attributable to being in the early days of a budding more lucrative career. We cannot attribute this observation to Bryant, whose status quo as a part-time employee has extended for six years and whose career as a lawyer most probably will never develop.

In *Ballard, supra,* the debtor was presently supporting a family of three on about $8,100.00 annual net income. However, the court found a definite prospect for more lucrative employment and the receipt of a large income-tax refund check sufficient to require the debtor to pay his student loan, although the court imposed a six-month moratorium and limited payments to $50.00 monthly. At page 923 n. 6 *supra,* indicated our unwillingness to impose what is effectively a Chapter 13 Plan on either the debtor or the creditor in a Chapter 7 case.

shall therefore order that Bryant's student loan obligation is discharged pursuant to § 523(a)(8)(B).